*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0302p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BRIAN PETTY,

        *Plaintiff-Appellant,*

    *v.*

METROPOLITAN GOVERNMENT OF NASHVILLE-
DAVIDSON COUNTY,

        *Defendant-Appellee.*

No. 07-5649

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 05-00680—Todd J. Campbell, Chief District Judge.

Argued: March 20, 2008

Decided and Filed: August 18, 2008

Before: KENNEDY, BATCHELDER, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Michael J. Wall, BRANSTETTER, STRANCH & JENNINGS, Nashville, Tennessee, for Appellant. Kevin C. Klein, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellee. **ON BRIEF:** Michael J. Wall, James G. Stranch III, BRANSTETTER, STRANCH & JENNINGS, Nashville, Tennessee, for Appellant. Kevin C. Klein, METROPOLITAN DEPARTMENT OF LAW, Nashville, Tennessee, for Appellee.

---

## OPINION

---

      ALICE M. BATCHELDER, Circuit Judge. Plaintiff–Appellant Brian Petty appeals the district court's summary judgment and judgment on partial findings in favor of Metropolitan Government of Nashville-Davidson County ("Metro") on claims that Metro violated his rights under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. §§ 4301 - 4334. Because the district court erred in its application of §§ 4312 and 4313, we reverse the district court's grant of summary judgment for Metro on two claims asserted under these provisions, and order that summary judgment be entered in favor of Petty on those claims. Further, because the district court made errors of both fact and law in its judgment on partial findings under § 4311, we vacate that judgment.

1

## I. BACKGROUND

The central dispute in this case is whether Metro violated USERRA in its treatment of Petty, a former police officer who left the department for active duty with the United States Army and who sought reemployment with the department after completion of his military service. There are few, if any, disputes regarding the factual background as described by the district court in its order granting summary judgment for Metro:

> The parties agree to the following facts: Plaintiff joined the Army National guard in 1986 and opted into the Army Reserve with the Army National Guard as his "reserve component" in 1989. The Defendant hired the Plaintiff as a police officer on February 1, 1991. In 1993, Metro assigned the Plaintiff to patrol the West sector of Nashville, where Plaintiff focused on crime prevention in housing projects. Metro promoted the Plaintiff to the rank of sergeant in January, 2000, whereupon he started supervising other officers in the South sector. After various reassignments, Plaintiff returned to patrolling the West sector in the fall of 2002, where he continued supervising other officers.
>
> All Metro police officers must get approval for off-duty work, and the Plaintiff sought and received Metro's approval to work as a security guard at the South Street and Bound'ry restaurants prior to his deployment.
>
> Plaintiff remained in the Army Reserve through 2003. In October of 2003, the Army called Plaintiff at work to tell him that he "was being transferred to another unit to take command as they were being mobilized" for service in Operation Iraqi Freedom. Plaintiff told his lieutenant at Metro, Kim Dillingham, of his upcoming military leave the same day that the Army informed him. The week after the Army contacted him, the Plaintiff took his first trip to Chattanooga to begin preparations for deployment, and he stopped working at Metro altogether on November 30, 2003.
>
> On January 2, 2004, the unit Plaintiff commanded had its official mobilization ceremony. The next day the unit left for Fort Stewart, Georgia. The unit was in Fort Stewart until roughly February 20, when it was transferred to Camp Navistar/Big Sky Oasis in Kuwait.
>
> The Army assigned the Plaintiff to run the "mayor's cell" at Camp Navistar. Plaintiff's unit ran the camp on a day-to-day basis - moving supplies; setting out bottled water for soldiers; handling any problems with housing, etc. The job also required Plaintiff to empty and store contraband from "amnesty boxes."
>
> In June or July, 2004, Command Sergeant Thomas Seuberling conducted a health and welfare inspection of Plaintiff's quarters. During the initial inspection, CSM Seuberling found a five-gallon jerry can (which looks like a gas can) that Plaintiff was using to manufacture homemade wine.[1]
>
> Plaintiff claims that he had alcohol in his tent because CSM Seuberling asked him to obtain alcohol. Specifically, Plaintiff claims that CSM Seuberling told him that

---

[1] Many of the statements made by Mr. Seuberling in his affidavit regarding this incident in Kuwait contradict the Plaintiff's testimony, and are disputed by the Plaintiff. As credibility determinations are inappropriate for summary judgment, and a factual finding as to the events that took place in Kuwait are unnecessary to the Court's decision, the Court does not rely on the disputed statements in Mr. Seuberling's affidavit.

he was negotiating with a Kuwaiti farmer to get him to cut down some trees that were blocking the camp's guard towers, and that the farmer would cut down the trees if he could get him some alcohol.

Based upon CSM Seuberling's health and welfare inspection, and the resulting investigation, Plaintiff was charged with a violation of the Military Code of Justice. Specifically, Plaintiff was charged with:  (1) violation of a lawful order; and (2) conduct unbecoming an officer.  With regard to the first charge, Plaintiff was accused of violating U.S. Central command General Order 1A, in that he was in possession of, and manufactured, alcohol.  By Plaintiff's own admission, he was in possession of, and was manufacturing, alcohol.  Plaintiff testified in his deposition that his intent in manufacturing wine in his tent was "mainly" to use it as an incentive for the farmer to clear trees, but he acknowledged that he may have used the wine for his own consumption eventually.  Plaintiff also admits receiving bottles of alcohol while in Kuwait, and using them for personal consumption.

With respect to the conduct unbecoming an officer charge, Plaintiff was accused of offering alcohol to enlisted soldiers.  By Plaintiff's own admission, he gave alcohol to a female enlisted soldier, Sergeant Melanie Barnhart.  Furthermore, by Plaintiff's own admission, he and Sergeant Barnhart drank together.  Plaintiff knew that giving alcohol to a soldier was a violation of General Order 1A.  Nevertheless, Plaintiff gave alcohol to Sergeant Barnhart anyway, and he drank with her.

In late 2004, Plaintiff appeared in front of a military judge, where he was arraigned. In lieu of going forward with court martial proceedings, Plaintiff submitted a request to resign his commission "for the good of the service."  When Plaintiff submitted his request to resign "for the good of the service," the Army relieved him of his command, meaning that he was relieved of his supervisory responsibilities. Plaintiff was notified on January 15, 2005 that his resignation "for the good of the service" had been approved.  The Army formally dismissed all charges against him in January 2005.

When he left active duty, Plaintiff received two versions of his Department of Defense Form DD-214.  One focuses on awards, commendations, and service dates, but does not include the "character of service."  The other includes the character of service.

Plaintiff's discharge was characterized as "under honorable conditions (general)." The Army returned Plaintiff to Fort Stewart, Georgia on or about February 1, 2005.

Plaintiff visited Metro to request reinstatement on February 28, 2005.  The Police Department has a return-to-work process for officers who have been away from the Police Department for an extended period of time.  This return-to-work process applies to all officers who have been away from the Police Department for an extended period of time, regardless of the reason for their separation.  The Police Department's return-to-work process includes a personal history update questionnaire, a medical examination, a computer voice stress analysis, a drug screening, and a debriefing with a Police Department psychologist.  In addition, the Police Department requests that returning officers execute a medical records authorization, and for individuals returning from military duty, an authorization to obtain military records.  The purpose of the Police Department's return-to-work process is to ensure that every individual entrusted with the responsibility of being

a Metropolitan Police Officer is still physically, emotionally, and temperamentally qualified to be a police officer after having being absent from the Department.

One of the questions on the personal history questionnaire Plaintiff filled out during the return-to-work process asked: "During your absence were you arrested, charged, detained, or a suspect in any criminal action or military disciplinary action for any reason or do you have any action pending? If yes, explain in detail (use back if necessary)." Plaintiff answered "Yes." He also attached a narrative explanation of his response in which he admitted facing military charges in Kuwait. The narrative description did not disclose: (1) that Plaintiff was accused of giving alcohol to an enlisted soldier; and (2) that Plaintiff was accused of manufacturing alcohol.

Plaintiff did not receive any salary or benefits for the period of examination between February 28, 2005 and March 21, 2005.

On March 21, 2005, Defendant returned the Plaintiff to work. Defendant did not, however, return the Plaintiff to his original position of patrol sergeant, or a substantially similar position. Plaintiff contends that he was assigned to an office job in which he primarily answered telephone calls from the public. Defendant states that Plaintiff has also taken police reports, which is a duty that must be performed by a sworn police officer.

The Metropolitan Police Department's Office of Professional Accountability ("OPA") serves the internal affairs function of the Metropolitan Police Department. OPA initiated an investigation focused on whether Plaintiff was honest and truthful[2] when he completed return-to-work paperwork after returning from military service. The Police Department's "Disciplinary/Corrective Action Grid" indicates that the Department has a zero tolerance for dishonesty.

On April 14, 2005, Metro issued a Notice of Complaint to Plaintiff outlining these charges. On May 10, 2005, Lieutenant Gordon Howey met with Plaintiff to discuss the charges against him. Based upon the results of this meeting, Lieutenant Howey prepared a report concluding that the allegation that Plaintiff was not truthful when he completed return-to-work paperwork was unfounded. Lieutenant Howey signed this report on May 17, 2005. On May 31, 2005, Kennetha Sawyers, the Director of OPA, signed Lieutenant Howey's report. Chief of Police Ronal Serpas accepted Mr. Howey's conclusions, and the director of OPA, Kennetha Sawyers, closed the investigation into Plaintiff on July 22, 2005. Additionally, on July 22, 2005, Ms. Sawyers sent Plaintiff a letter stating that OPA had completed its investigation and determined that the charges against him were unfounded.

Also, on July 22, 2005, Metro informed Plaintiff that the Peace Officer Standards Training ("POST") Commission, which certifies Metro police officers, did not accept his discharge. At that time, a Police Department employee named Calvin Hullett served as the POST Commission chairman. Metro "specifically" did not request a waiver for Plaintiff from the POST Commission.

---

[2] Although the Defendant indicates the investigation followed a computer voice-stress analysis of the Plaintiff that indicated deception, the Court does not consider the results of that analysis for purposes of the pending motion as Defendant has failed to file an affidavit describing that analysis or one authenticating the exhibit purporting to be the results of the analysis.

After sending Plaintiff the July 22, 2005 letter, Ms. Sawyers states that she continued to be troubled by the disconnect between Plaintiff's description of the events leading to his discharge, and the severity of his punishment. Accordingly, in mid-August Ms. Sawyers contacted a representative from the U.S. Army to request additional documents and information from Plaintiff's file. During this conversation, Ms. Sawyers discovered that the DD-214 Plaintiff submitted to the Metropolitan Government appeared to have been "altered." Plaintiff contends that the difference between the official copy and the one he submitted to Metro does not constitute an "alteration." Based upon this new information, Ms. Sawyers requested a copy of Plaintiff's DD-214 from the Tennessee Department of Veteran's Affairs.

On September 1, 2005, Georgia Norman, chief of War Records, sent OPA a copy of Plaintiff's DD-214 via facsimile. The form submitted by the Plaintiff to Metro omitted a few boxes at the bottom, including Box 28, which listed Plaintiff's "Narrative Reason for Separation" as "in lieu of trial by court martial." The form also omitted Blocks 29 and 30.

During his deposition testimony and in response to Defendant's requests for admission, Plaintiff admitted that he did not provide a complete copy of his DD-214 to Metro. Each DD-214 contains the following language in the top right hand corner: "Any alterations in shaded areas render form void." Box 28 of the DD-214 is a shaded area. During his deposition, Plaintiff testified that when he copied his DD-214, the copy was enlarged, which cut off Boxes 28, 29 and 30. He testified that he did not intentionally enlarge the form. Later in the deposition, Plaintiff said he could not remember if he intentionally removed Boxes 28, 29 and 30. In his response to a Request for Admission, however, Plaintiff stated that he "caused [the] form to be enlarged on a copying machine thinking that the relevant portion of that document would be more readable to the Defendant."

Metro contends that this new information received by Ms. Sawyers led to OPA's second investigation into Plaintiff's conduct, which focuses on whether Plaintiff intentionally altered the DD-214 he provided to the Metropolitan Government. Plaintiff contends that the actual reason for the second investigation was to retaliate against the Plaintiff for filing this lawsuit. When Ms. Sawyers conducted the follow-up research that lead to OPA's second investigation of Plaintiff's conduct, Plaintiff had not filed a lawsuit, and Ms. Sawyers was not aware that he was contemplating filing a lawsuit. Plaintiff points out that Ms. Sawyers' research ended five days before he filed suit, on September 6, 2005, and that Ms. Sawyers knew about the lawsuit before Metro filed its second Notice of Complaint against the Plaintiff on October 21, 2005. Plaintiff told superiors that he was contemplating a lawsuit months before he filed it.

Since approximately October 10, 2005, Defendant has assigned Plaintiff to the Central Station "bubble," where he has continued answering telephone calls from the public. Traditionally, Metro staffs the bubble with officers facing discipline or who are otherwise "disempowered."

On December 21, 2005, Plaintiff requested Metro's permission to return to his off-duty security jobs at South Street and Bound'ry. Metro denied Plaintiff's request for off-duty employment.

*Petty v. Metro. Gov't of Nashville-Davidson*, No. 3:05-0680, 2006 U.S. Dist. LEXIS 83787 at *2-16 (M.D. Tenn. Nov. 16, 2006) (internal citations omitted; footnotes in original). Pertinent to this

appeal, Petty's complaint alleged that Metro violated his rights under USERRA in that: (1) Metro delayed rehiring him for the purpose of subjecting him to the department's return-to-work process; (2) Metro did not properly rehire him because he was not placed in the position to which he was entitled; and (3) Metro impermissibly denied him the ability to work off-duty security jobs. These claims were asserted as violations of the reemployment provisions of USERRA, §§ 4312-4313, and the antidiscrimination provision of the Act, § 4311. Both parties moved for summary judgment. Petty's motion was denied, and the district court granted Metro's motion on all claims except those arising from the denial of Petty's request for off-duty work. The off-duty work claims proceeded to a bench trial, at the conclusion of which the district court entered a judgment on partial findings in favor of Metro. Petty now appeals.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment, using the same standard applied by the district court. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc). Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). We must review all the evidence, facts, and inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To withstand summary judgment, the nonmoving party must present sufficient evidence to create a genuine issue of material fact. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). "A mere scintilla of evidence is insufficient; 'there must be evidence on which the jury could reasonably find for the [non-movant].'" *Id.* at 734-35 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the law and record makes it appropriate, we may not only reverse the district court's entry of summary judgment, but we may instruct the district court to enter summary judgment against the previously victorious party. *See, e.g., Daniels*, 396 F.3d at 737.

A different standard is applied to the entry of a judgment on partial findings. The district court is not required to draw any special inferences, and it is permitted to weigh the evidence and resolve any conflicts therein. *Int'l Union of Operating Eng'rs, Local Union 103 v. Indiana Constr. Corp.*, 13 F.3d 253, 257 (7th Cir. 1994). On appeal, we review legal determinations de novo and the relevant findings of fact for clear error. *Sharp ex rel. Estate of Sharp v. United States*, 401 F.3d 440, 443 (6th Cir. 2005).

## III. STRUCTURE OF USERRA

Statutory protection of job security for armed services members has a long history, dating back to the Selective Training and Service Act of 1940. USERRA is the latest iteration of these protections, and was enacted in part as a result of Congress's finding that "existing veteran's right statutes [were] overly complex and ambiguous, leaving veterans and employers confused as to their rights and responsibilities." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 304 (4th Cir. 2006) (quoting *Lapine v. Town of Wellesley*, 970 F. Supp. 55, 58 n.2 (D. Mass. 1997)). Congress thus sought "to clarify, simplify, and where necessary, strengthen the existing veterans' employment and reemployment rights provisions." *Id.* Courts have recognized that "[b]ecause USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." *Francis*, 970 F.3d at 303 (alteration in original). Relevant pre-USERRA case law is properly considered as a guide to interpreting USERRA. *Id.*

For the purposes of this case, USERRA performs four key functions. First, it guarantees returning veterans a right of reemployment after military service. 38 U.S.C. § 4312. Second, it prescribes the position to which such veterans are entitled upon their return. 38 U.S.C. § 4313.[3] Third, it prevents employers from discriminating against returning veterans on account of their military service. 38 U.S.C. § 4311. Fourth, it prevents employers from firing without cause any returning veterans within one year of reemployment. 38 U.S.C. § 4316.

At times, the interplay among these provisions has caused some confusion. *Compare Curby v. Archon*, 216 F.3d 549, 557 (6th Cir. 2000) (stating that to recover for a reemployment violation under § 4312, a plaintiff also must show discrimination under § 4311) *with Wrigglesworth v. Brumbaugh*, 121 F. Supp. 2d 1126, 1133-39 (W.D. Mich. 2000) (concluding that recovery under § 4312 is separate from and not in any way dependent upon § 4311). We find helpful the Eighth Circuit's description of the relationship among the provisions at issue in this case:

> Section 4312 protects service members at the instant of seeking reemployment, entitling the service member to reemployment in either the position she would have been in had she not left for military service "or a position of like seniority, status and pay, the duties of which the person is qualified to perform." 38 U.S.C. § 4313(a)(2)(A) (defining rights set forth in § 4312, which entitles a person to be rehired upon return from military service). Section 4311 applies after reemployment has occurred and "prohibits discrimination with respect to any benefit of employment against persons who serve in the armed services after they return from a deployment and are reemployed." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 304 (4th Cir. 2006) (noting that § 4312 protects military members up to the instant of reemployment while other sections of USERRA, such as § 4311 and § 4316, protect the member after reemployment occurs).[4]

*Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 930 (8th Cir. 2008). We will use this understanding of USERRA to examine Petty's claims.

## IV. REEMPLOYMENT CLAIMS

As it pertains to this case, USERRA's right to reemployment encompasses two guarantees that are embodied in §§ 4312 and 4313. Section 4312 sets forth the basic right of a returning veteran to be rehired by his past employer and the basic prerequisites that the veteran must meet in order to enjoy that right. Section 4313 sets forth the position of employment to which the returning veteran must be rehired and requires that the veteran be "promptly reemployed" in that position. As briefly discussed above, Petty alleges that Metro violated his reemployment rights by: (1) impermissibly delaying his rehiring due to the department's return-to-work process; (2) failing to rehire him in the position to which he was entitled; and (3) impermissibly denying him permission to work off-duty security jobs. We find that Petty is entitled to summary judgment with respect to his first two claims; the third, which we will analyze separately, is not properly asserted as a reemployment claim under §§ 4312 and 4313.

---

[3] Due to the close relationship of § 4312 and §4313, throughout this opinion we often refer to them collectively as USERRA's reemployment provisions.

[4] The actual language of § 4311 may not limit its application to returning veterans. *See, e.g., Coffman v. Chugach Support Servs.*, 411 F.3d 1231, 1234 (11th Cir. 2005) ("Section 4311 prohibits employers from discriminating against employees on the basis of military service and retaliating against individuals, whether service members or not, who testify or give statements on behalf of a USERRA claimant."). Such differences, however, do not affect the current case.

**A.  Petty's First Two Claims - Delay in Rehiring and Failure to Hire at Proper Position**:

Congress has clearly prescribed the prerequisites Petty was required to satisfy to qualify for USERRA's reemployment protection.  First, he was required to notify his employer in advance of his departure that he would be leaving for military service.  38 U.S.C. § 4312(a)(1).  Second, the cumulative length of such military service must be less than 5 years.  38 U.S.C. § 4312(a)(3).  Third, upon his return, he was required to request reemployment from Metro within the time frame outlined in § 4312(e) and with the documentation specified by § 4312(f).  Fourth, his separation from service must have been under "honorable conditions."  38 U.S.C. § 4304(2).  Metro contends only that Petty failed to provide the documentation requirements of § 4312(f)(1), which provides that upon the request of the employer, the returning veteran shall provide documentation establishing that he has satisfied these four prerequisites.

In 20 C.F.R. § 1002.123, the Department of Labor lists documents that satisfy the documentation requirements of 38 U.S.C. § 4312.  Among those listed is a form DD-214, which Metro concedes Petty provided.  But Metro argues that Petty's DD-214 is not sufficient, because the copy of the form that Petty sent Metro did not include three fields at the bottom of the form — most notably one including the statement "Narrative Reason for Separation:  In lieu of trial by court-martial."  Furthermore, Metro argues, the DD-214 was "void" because the failure to include all fields constituted an alteration voiding the form.  Petty counters that his DD-214 included all the information necessary under the documentation requirements of § 4312(f)(1).

We conclude that it would be inconsistent with the goals of USERRA to prevent Petty from exercising his right to reemployment because he failed to provide forthrightly information that is statutorily unnecessary to his establishing the right in the first place.  First, 20 C.F.R. § 1002.123(a)(2) expressly recognizes that the types of documentation necessary to establish eligibility for reemployment may vary from case to case.  The focus of USERRA is on securing rights to returning veterans, not on ensuring that any particular documentation is produced.  Second, in compliance with Metro's return-to-work process, Petty signed an authorization granting Metro unfettered access to all of his medical and military records, including a complete DD-214.[5]  Accordingly, we find that Petty satisfied USERRA's documentation requirement, and, inasmuch as Metro does not dispute his having satisfied the other statutory prerequisites, it is apparent that he established his right to reemployment as guaranteed by §§ 4312 and 4313.

Metro, therefore, was not permitted to delay or otherwise limit Petty's reemployment rights in any way; in particular, Metro was not permitted to limit or delay Petty's reemployment by requiring him to comply with its return-to-work process.  Section 4302(b) expressly states that USERRA "supersedes any . . . contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by this chapter, including the establishment of additional prerequisites to the exercise of any such right or the receipt of any such benefit."  By applying its return-to-work process to Petty, Metro not only delayed his reemployment, but as we shall explain, it also limited and withheld benefits to which Petty was entitled under USERRA.

It is of no consequence here that Metro believes it is obligated to "ensure that each and every individual entrusted with the responsibility of being a Metropolitan Police Officer is still physically, emotionally, and temperamentally qualified to be a police officer after having been absent from the Department."  In USERRA, Congress clearly expressed its view that a returning veteran's reemployment rights take precedence over such concerns.  Metro does not question Petty's physical

---

[5] We express no opinion as to whether the employer may, consistent with USERRA's provisions, request such a waiver.

qualifications; instead, it questions only whether his conduct during his military service would disqualify him from returning to service in the police department. But Petty's separation from military service is classified as "under honorable conditions," which Congress has made clear suffices to qualify him for USERRA benefits, 38 U.S.C. § 4304(2). To the extent that his military service may have in fact left Petty unfit to carry out his duties as a police officer but is not reflected in the classification of his separation from service, USERRA would allow, after his reemployment, a "for cause" termination of that employment. 38 U.S.C. § 4316. Furthermore, Congress recognized USERRA would limit the ability of employers to rescreen returning veterans, but still chose to make this the general rule under USERRA. This is evident because, in certain circumstances, Congress altered this general rule to allow vetting of returning veterans before full rehiring. Section 4315 allows the heads of agencies listed under 5 U.S.C. § 2302(a)(2)(C)(ii) – e.g., FBI, CIA, NSA – to "prescribe procedures for ensuring that the rights under [USERRA] apply to employees of such agency." 38 U.S.C. § 4315(a). Congress did not grant similar discretion to local police departments; therefore, Metro's return-to-work process as applied to Petty was in violation of USERRA's reemployment provisions.

The district court determined that Metro's return-to-work procedures could be applied to Petty, finding that because they are applicable to all individuals regardless of military service, these procedures did not constitute "additional prerequisites." In this, the district court erred. First, § 4302(b) does not limit its superseding effect only to "additional prerequisites." It supersedes any "policy, plan, [or] practice" that "reduces, limits, or eliminates in any manner any right or benefit" provided by USERRA, "including," but not necessarily limited to, "the establishment of additional prerequisites." Second, Metro's return-to-work procedures *do* constitute "additional prerequisites" for returning veterans, because the procedures are in addition to the requirements Congress specified for the exercise of USERRA's reemployment rights. The district court apparently viewed the term "additional prerequisites" as meaning "additional to the *employer's* existing prerequisites," and concluded that Metro's procedures are not discriminatory because they apply to all individuals returning to the department. But this analysis is not appropriate for a claim brought under § 4312, and the superseding effect of § 4302(b) is not so limited; Metro's return-to-work procedures are indeed superseded by USERRA's reemployment provisions.

It is important to note that Petty was not required to make any showing of discrimination in order to sustain either of his reemployment claims. The district court incorrectly characterized part of Petty's reemployment claim — that part dealing with the position to which he was reinstated — as being part of his discrimination claims and therefore held that it required a showing of discrimination. The district court did not state its authority for this, but Metro finds support for the court's view in the following language from this Circuit's decision in *Curby v. Archon*: "a person seeking relief under § 4312 must also meet the discrimination requirement contained in § 4311." 216 F.3d at 557. However, this language from *Curby* was merely dicta and is therefore not binding precedent. *See Wrigglesworth*, 121 F. Supp. 2d at 1137 (characterizing this part of *Curby* as dicta); *Jordan v. Air Prods. & Chems., Inc.*, 225 F. Supp. 2d 1206, 1208 (C.D. Cal. 2002) (same). Furthermore, subsequent to *Curby*, the Department of Labor specified that "[t]he employee is not required to prove that the employer discriminated against him or her because of the employee's uniformed service in order to be eligible for reemployment." 20 C.F.R. § 1002.33; *accord Francis*, 452 F.3d at 303 ("[T]he procedural requirements of the two provisions differ. An employee proceeding under § 4311 has the burden of proving that the employer discriminated against him or her based on a status or activity protected by USERRA. 20 C.F.R. § 1002.22 (2006). Section 4312 imposes no such burden. 20 C.F.R. § 1002.33 (2006)."). Finally, the imposition of § 4311's discrimination requirement on a reemployment claim is not consistent with the plain language of §§ 4312 and 4313. Section 4313 states that any "person entitled to reemployment under section 4312" — which we have found Petty to be — "shall be promptly reemployed in a position of employment in accordance with the" order of priority outlined in § 4313(a)(2). Thus, the express

terms of § 4313 make its application contingent only on the prerequisites of § 4312, none of which include a showing of discrimination.

Because we have found that Petty met § 4312's prerequisites, and that § 4313 is applicable here notwithstanding any discrimination considerations, we must now determine whether Metro violated § 4313 in failing to rehire Petty at the appropriate level of employment. Section 4313 provides the order of priority for the placement of returning veterans:

> (2) Except as provided in paragraphs (3) and (4), in the case of a person whose period of service in the uniformed services was for more than 90 days--
>
>> (A) in the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or a position of like seniority, status and pay, the duties of which the person is qualified to perform; or
>>
>> (B) in the position of employment in which the person was employed on the date of the commencement of the service in the uniformed services, or a position of like seniority, status and pay, the duties of which the person is qualified to perform, only if the person is not qualified to perform the duties of a position referred to in subparagraph (A) after reasonable efforts by the employer to qualify the person.
>
> . . . .
>
> (4) In the case of a person who (A) is not qualified to be employed in (i) the position of employment in which the person would have been employed if the continuous employment of such person with the employer had not been interrupted by such service, or (ii) in the position of employment in which such person was employed on the date of the commencement of the service in the uniformed services for any reason (other than disability incurred in, or aggravated during, service in the uniformed services), and (B) cannot become qualified with reasonable efforts by the employer, in any other position which is the nearest approximation to a position referred to first in clause (A)(i) and then in clause (A)(ii) which such person is qualified to perform, with full seniority.

38 U.S.C. § 4313(a). Metro does not dispute that Petty was not placed in any of the positions apparently mandated by § 4313 (e.g., his former position as patrol sergeant). Rather, Metro argues only that it did not violate § 4313 because, having perhaps been dishonest in the return-to-work process, Petty may not be qualified to hold these positions. This argument is without merit.

At the point at which Petty was entitled to reemployment under §§ 4312 and 4313, Metro had no basis on which to question his qualifications. Petty had satisfied the only prerequisites to § 4313 — those specified in § 4312 — and Metro's attempt to impose additional prerequisites through its return-to-work process was, as we have already explained, wholly impermissible. *See* 38 U.S.C. § 4302(b) (USERRA supersedes local policies). The process, then, including Petty's

alleged "dishonesty" therein, cannot serve as a basis for delaying or otherwise limiting Petty's right to reemployment.[6]

Furthermore, Metro cannot avoid this conclusion by arguing that its second investigation into Petty's conduct during the return-to-work process had not been completed at the time of Petty's filing of this action, and Metro therefore had not been able to determine whether Petty was qualified for reemployment in his original position with the police department. First, investigations spawned by the improper application to Petty of the return-to-work process cannot serve to delay Petty's statutory right to reemployment if the prerequisites for reemployment have been met. Second, § 4313 includes a promptness requirement that Metro clearly violated notwithstanding any concerns that it may have harbored regarding Petty's truthfulness. "Prompt reemployment" required by § 4313(a) means reemployment

> as soon as practicable under the circumstances of each case. *Absent unusual circumstances, reemployment must occur within two weeks of the employee's application for reemployment.* For example, prompt reinstatement after a weekend National Guard duty generally means the next regularly scheduled working day. On the other hand, prompt reinstatement following several years of active duty may require more time, because the employer may have to reassign or give notice to another employee who occupied the returning employee's position.

20 C.F.R. § 1002.181 (emphasis added). Because of its return-to-work process, Metro took three weeks to "rehire" Petty, and even then it did not place Petty in the correct position as outlined in § 4313. Metro cannot justify these delays; neither a return-to-work process that has been superseded by statute nor any investigations resulting from that process constitute the "unusual circumstances" that the Department of Labor has specified may justify a less timely reinstatement. 20 C.F.R. § 1002.181. Third, in any event, the burden of proving that a returning veteran is not qualified under § 4313 falls on the employer, not on the employee. *McCoy v. Olin Mathieson Chem. Corp.*, 360 F. Supp. 1336, 1339 (S.D. Ill. 1973). Metro cannot defeat the "prompt reemployment" guarantee of § 4313 by engaging in never-ending investigations into Petty's qualifications. Indeed, courts have recognized that:

> It is presumed under the law that a veteran, who was qualified for his employment status upon its termination by his entry into the active military service of the United States, remains qualified to claim reemployment upon his discharge from such active military service. . . . An employer who refuses to reemploy a discharged veteran who has timely applied for reemployment has the burden of proving the veteran's disqualification for reemployment.

*Id.* Metro has never *proved* Petty's disqualification for reemployment. Indeed, even today, approximately three years after Petty originally sought reemployment, Metro simply argues that, pending the outcome of its second investigation, it believes that Petty *may* be unqualified. Metro has wholly failed to carry its burden of proving Petty's disqualification and has therefore clearly violated § 4313.[7]

---

[6] It may be that dishonesty regarding military service and discharge on the part of a returning veteran would suffice to establish cause for termination under § 4316. However, such a conclusion is not obvious and it is not necessary for disposition of this case; we therefore express no opinion on this matter.

[7] At oral argument the parties indicated that Petty is no longer employed at Metro. This may limit the type of relief available to Petty on remand (e.g., placing Petty in the position of patrol sergeant may not be possible at this time); however, we leave these issues for the district court to determine.

**B.  Petty's Third Claim – Denial of his Request for Off-Duty Work:**

On appeal, Petty also argues that Metro denied him reemployment rights when it refused to approve his request for off-duty security work.  Although it is not clear whether Petty made this argument to the district court, we will briefly explain why this claim is not properly asserted under §§ 4312 and 4313.

Section 4312 "only entitles a service person to immediate reemployment and does not prevent the employer from terminating him the next day or even later the same day." *Francis*, 452 F.3d at 304.  Likewise, once the returning veteran is rehired, § 4312 does not prevent the employer from discriminating against him.  "The apparent harshness of this result is addressed by the fact that §§ 4311 and 4316 operate to protect the employee as soon as []he is reemployed." *Id.*  Petty did not request permission to engage in off-duty work — and was thus not denied such permission — until approximately ten months after he was reemployed.  Section 4312, therefore, is not implicated by Metro's denial of this request.

Furthermore, notwithstanding the timing problem, Petty's ability to engage in off-duty security work is not the type of benefit protected by USERRA's right to reemployment.  Section 4312 protects only a service person's right to reemployment, which in turn triggers § 4313's guarantee of the appropriate position of employment.  Section 4313 protects only the service person's "seniority, status and pay." *See* §§ 4313(a)(2)(A), 4313(a)(2)(B).  While the ability to perform off-duty work may well have been an added benefit of Petty's position at Metro, it is not part of Petty's "seniority, status and pay."  Because §§ 4312 and 4313 do not protect the type of general "benefits" that would include Petty's off-duty work, this claim may not be brought under these provisions.[8]  However, as we explain in the following section, the antidiscrimination provision of § 4311 is applicable.

## V.  DISCRIMINATION CLAIMS

Petty argues that claims for failure to rehire promptly, failure to rehire at the correct position, and denial of his request to perform off-duty work also constitute violations of USERRA's antidiscrimination provision, § 4311.  We have already determined that Petty is entitled to summary judgment on his claims for failure to promptly and properly rehire under §§ 4312 and 4313; because he would obtain no added benefit from our addressing them under § 4311, we will not address them further.  We will, however, examine his off-duty employment claim under § 4311.  Because the district court erred in its legal analysis of this claim, and because it clearly erred in its finding that no evidence in the record supported this claim, we reverse its judgment on partial findings.

To begin, Petty's ability to engage in off-duty security work is the type of benefit protected under § 4311.  As it pertains to these claims, § 4311 provides the following:

---

[8]  Although Petty does not cite § 4316, it provides that:

> A person who is reemployed under this chapter [38 USCS §§ 4301 et seq.] is entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed.

38 U.S.C. § 4316(a).  Even if Petty had cited this provision, its value to him is questionable.  First, given that the benefits protected are only those "determined by seniority," this provision would appear to protect only benefits directly tied to his employment at Metro.  Second, even if this provision does protect benefits indirectly tied to employment, such as Petty's ability to engage in off-duty security work, the record contains no indication that this benefit is "determined by seniority," and it would therefore not be the type of benefit protected by § 4316.

(a) A person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or *any benefit of employment* by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

. . . .

(c) An employer shall be considered to have engaged in actions prohibited--
   (1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service;
. . . .

38 U.S.C. § 4311 (emphasis added).  The ability to obtain additional income by working as an off-duty security officer was certainly a "benefit" of serving as a Metro police officer, so any discrimination with respect to this benefit on account of Petty's military service would violate § 4311.

An individual bringing a § 4311 claim has the initial burden of proving a prima facie case of discrimination by showing, by a preponderance of the evidence, that his protected status was a substantial or motivating factor in the adverse employment action(s).  The burden then shifts to the employer to prove the affirmative defense that the employment action(s) would have been taken in the absence of the employee's protected status.  *See* 38 U.S.C. § 4311(c)(1); *Coffman v. Chugach Support Servs.*, 411 F.3d 1231, 1238-39 (11th Cir. 2005); *Gummo v. Village of Depew*, 75 F.3d 98, 106 (2d Cir. 1996).

For Petty's military service to have been "[a] motivating factor does not mean that it had to be the sole cause of the employment action.  Instead, it is one of the factors that a truthful employer would list if asked for the reasons for its decision." *Coffman*, 411 F.3d at 1238.  "[M]ilitary status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Id.*  "[B]ecause USERRA was enacted to protect the rights of veterans and members of the uniformed services, it must be broadly construed in favor of its military beneficiaries." *Francis*, 452 F.3d at 303; *accord Alabama Power Co. v. Davis*, 431 U.S. 581, 585 (1977).

Metro argues that Petty was denied permission to engage in off-duty employment because he was being investigated at the time of his request and Metro has a policy against approving off-duty requests for officers under investigation.  The district court concluded that this policy was the motivating factor behind Metro's denial, that the policy was a legitimate reason and not a pretext for that decision, and that Metro's action was not discriminatory and did not violate USERRA.  We conclude that the district court erred in its analysis.

In accepting Metro's justification regarding its policy, the district court failed to consider Metro's motivations for launching the investigation that triggered the policy's application to Petty in the first place.  Because "[a] motivating factor does not mean that it had to be the sole cause of the employment action," *Coffman*, 411 F.3d at 1238, the fact that Metro had a legitimate reason for denying Petty's request does not prove that the denial did not also have an improper motivation.  This is important in this case, because Petty came within the ambit of the "legitimate" policy only because he was under investigation.  If that investigation was motivated by an improper purpose,

then it follows that the denial of benefits on the basis of the investigation's existence was also motivated, at least in part, by an improper purpose.

The district court also erred in concluding "that the investigations by [Metro] were non-discriminatory and did not violate USERRA." Metro has undertaken two separate investigations of Petty. The first was launched on April 14, 2005, to investigate concerns about Petty's honesty in disclosing the details of his military arrest and discharge. These concerns were determined to be "unfounded" in May of 2005, and the investigation was formally closed on July 22, 2005. The second investigation was launched on October 21, 2005, and was aimed at determining whether Petty's submission of a form DD-214 with three fields missing violated department rules against the withholding of information. We will focus on the motivation behind this second investigation, as it was the one ongoing at the time of Petty's request for off-duty work and therefore responsible for triggering the policy requiring Metro to deny his request.

Metro contends that the second investigation generally concerns Petty's truthfulness, and more specifically, his submitting to the Police Department "an altered 'Certificate of Release or Discharge from Active Duty.'" In other words, Metro argues that this second investigation, although indirectly involving his military service, is solely motivated by concerns for Petty's honesty and truthfulness.

The district court concluded that "[t]he only evidence before the Court that [Petty]'s military status was a motivating factor in [Metro]'s decision is the opinion of [Petty] himself . . . ." We find this conclusion clearly erroneous. The record contains a chain of email correspondence that took place after the first investigation was concluded but prior to the second investigation. The following is an excerpt from that chain:

> We probably all need to put our heads together and decide if there are areas of conduct that occurred while he was away from the department (so off duty, but while serving in the military as Captain) that would constitute behavior for which we would not allow of any other off duty employee. I know we need every able bodied person we can get, but I do not want us to jump the gun and find ourselves embarrassed when his conduct comes under public scrutiny.

This message was sent by Deputy Chief Honey Pike to four individuals, including OPA Director Kennetha Sawyers, approximately two months after the OPA concluded a report finding no merit to concerns about Petty's honesty, and two days prior to Sawyers' formally closing that investigation. Approximately one month after this message was sent, Sawyers decided to do some independent "digging" by calling the Army to inquire further into Petty's service and discharge. This inquiry revealed that the DD-214 submitted by Petty had three fields omitted at the bottom of the document, and this discovery prompted Metro's second investigation.

This email establishes: (1) that after the first investigation was complete, there was still concern regarding Petty's *conduct in service*, not his honesty, amongst those who initiated the second investigation, and (2) that the informal investigation that led to the second, formal investigation was quite possibly motivated by those concerns about Petty's military service. Indeed, Sawyers' testimony appears to confirm this latter point; she testified that she continued to investigate Petty — even after signing off on the first investigation's conclusion that the concerns about his honesty were "unfounded" — because she was "uncomfortable with the fact that [Metro] [was] not able to get as much information as [she] wanted with regard to the actual circumstances" of Petty's offense and discharge.

In reaching a judgment on partial findings, a district court must weigh and balance the evidence — all of the evidence. Because the district court failed to do that here, we vacate the

judgment on partial findings, and remand to the district court Petty's discrimination claim brought under § 4311.

## VI.  CONCLUSION

For the foregoing reasons, we **REVERSE** the order of the district court granting summary judgment to Metro on Petty's claims that Metro violated his rights under 38 U.S.C. §§ 4312 and 4313 by failing to reemploy him promptly and properly, and we **VACATE** the order of the district court granting a judgment on partial findings to Metro with respect to Petty's § 4311 discrimination claim.  We **REMAND** this matter to the district court with instructions to enter summary judgment in favor of Petty on the reemployment claims and to determine the resultant damages, and with regard to the discrimination claim, to conduct further proceedings not inconsistent with this opinion.