**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0617n.06

No. 08-4296

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Sep 17, 2010**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellee*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| CHARLES E. GOFF, JR., | ) | **O P I N I O N** |
| | ) | |
| *Defendant-Appellant*. | ) | |

BEFORE:    BATCHELDER, Chief Judge; MOORE and COLE, Circuit Judges.

**COLE, Circuit Judge.** Defendant-Appellant Charles Goff, Jr. appeals his conviction and sentence on one count of conspiracy to distribute and to possess with intent to distribute more than five kilograms of cocaine and 100 kilograms of marijuana and one count of conspiracy to launder money. The district court sentenced Goff to 360 months in prison, running consecutive to the federal sentence he already was serving at the time of trial. On appeal, Goff challenges both his convictions and his sentence. Based on the following analysis, we **AFFIRM** Goff's convictions, **VACATE** his sentence, and **REMAND** for resentencing.

## I.  BACKGROUND

### A.  Factual Background

The evidence presented at trial revealed that Goff was engaged in drug-dealing activity for over a decade. The charges on which he was indicted were limited to a shorter, discrete portion of

this time period. However, two of Goff's primary arguments on appeal address whether these activities constituted a single conspiracy or multiple conspiracies. Therefore, we set forth factual background covering this entire period in some detail.

### 1. Goff's Pre-Arrest Drug-Dealing Activity

Goff grew up in Dayton, Ohio, and began selling drugs with his friend Todd "Swifty" Brown while they were in high school in the mid-1980s. They started out selling retail amounts of cocaine, but in 1988, Goff, Brown, and Goff's father, Charles Goff, Sr., began selling heroin. Goff and his father provided the connection to their drug supplier. Brown accompanied Goff to Chicago on two occasions to pick up heroin from their supplier. Sometimes, the three men would process the heroin at Goff's father's automobile repair shop in Dayton, Charlie's Car Care.

Around 1993, Goff, his father, and Brown moved from selling heroin to selling powder cocaine. Goff's father "took a back seat" in the operation at this point, and Brown worked for Goff transporting shipments of cocaine from Chicago to Charlie's Car Care in automobiles with secret compartments. (District Court Record Entry ("R.") 601, at 102.) They continued this operation for the next several years, and over time, they employed several more drivers, including Goff's former brother-in-law, Fred Smith. During this time, one of Goff's customers—who bought cocaine for resale—was an acquaintance of Goff's named Earl Marshall. Tico Hill worked as Marshall's "right hand man" during this period and had no direct dealings with Goff. Similarly, Marshall did not deal directly with Brown or Smith.

On September 25, 1996, federal agents stopped a vehicle transporting cocaine from Chicago to Dayton. The officers arrested the two couriers, Juan Carlos Myron Abela and Mario Jesus

Calbren Valenzuela, and then made a controlled delivery of cocaine to Charlie's Car Care, where

Goff and his father were arrested. Goff was released on bond roughly a week later and was

committed to home confinement at his mother's residence. Goff remained on house arrest until early

1999.

### 2. Goff's Drug-Dealing Activity While on House Arrest

Shortly after Goff was released on bond, Marshall approached Goff and told Goff that he

needed money. A week or two later, Smith and Marshall met and discussed going into business

selling cocaine together. A week later, Smith directed Marshall to obtain a warehouse with enough

space to accommodate a semi-truck where they could receive shipments of cocaine. Marshall found

a warehouse to lease on South Broadway Street in Dayton, and after discussing with Goff how he

should pay for the warehouse, Marshall took out a second mortgage on his home to pay a year-long

lease.

Before receiving the first shipment of cocaine at the warehouse, Goff, Marshall, and Smith

came to an agreement about how they would share the profits and divide responsibilities. They

planned to buy cocaine at $18,000 to $19,000 per kilogram, mark it up by $3000 per kilogram, and

resell it. Marshall testified that under this arrangement, for each kilogram of cocaine sold, "I was

to keep $1,000. I was to give Fred Smith $2,000, which he would split up with Charles Goff, Jr.

We split $1,000 each."[1]  (R. 607, at 22.)  Marshall described Goff's role in this operation as a

---

[1]Brown's testimony differed on the specifics of this agreement. Brown stated that shortly
after Goff was released on bond, he, Goff, and Marshall "had a conversation [about Marshall's]
involvement with the cocaine. Charles Goff told me that [Marshall] would now be in charge of
distributing the cocaine. And that the price was $21,000 and it would be increased by $2,000 per

"[s]ilent partner." (*Id.* at 41.) As Hill described it, after Goff's arrest, Goff's "role was basically now like an overseer, you know. He is in charge of [Marshall] and [Marshall] is in charge of me." (R. 610, at 102.) Aside from taking his share of the profits, Goff's role mostly was limited to maintaining contact with the supplier in Chicago.

They received their first shipment of cocaine at the Broadway Street warehouse in March 1997 via a semi-truck driven by Clayton Kendall, who was hired by the suppliers in Chicago. Marshall estimated that Kendall made twenty-five trips to their warehouse between March 1997 and January 1999. Roughly fifteen of these trips were to deliver cocaine and the rest were to pick up money. Each delivery contained an average of forty kilograms of cocaine. Over this two-year period, they received and resold roughly 600 kilograms of cocaine, which corresponded to $1,800,000 in profits split evenly between Goff, Marshall, and Smith.

The shipments stopped in January 1999 for several months because Kendall and a number of other individuals on the Chicago side of the operation were arrested. Around the same time, Goff's bond was revoked and he was incarcerated in county jail. Because of the Chicago arrests, Marshall wanted to obtain a new property to receive their shipments. Shortly after the arrests, Marshall purchased a property in a rural area on Diamond Mill Road. The title to the property originally was placed in Tico Hill's name, because he could secure a loan, but later was transferred to another conspirator's name "to conceal the identity of the owner of the property." (R.E. 607, at 40.) In order to make a down payment on this new property, Marshall sold Goff's Plymouth Prowler

---

kilo. And that would be [Goff's] cut off the cocaine. . . . [I]f [Goff] was incarcerated . . . the money was to go to Fred Smith, his brother-in-law[,] or David Scott . . . ." (R. 601, at 112.)

automobile, which he had been storing for Goff. A car dealer named Jerry Manka had purchased the Prowler for Goff in December 1998. Goff had paid Manka in cash, and the car's title remained in Manka's company's name although Goff actually owned the vehicle.

After purchasing the property on Diamond Mill Road, it became more common for Marshall and Hill—or couriers they hired—to pick up the shipments of cocaine from Chicago. However, they did receive at least two shipments of drugs at the Diamond Mill Road property. One of these shipments contained marijuana instead of, or in addition to, cocaine. These shipments arrived in a semi-truck with the drugs packed into cement roadblocks, which Marshall and his associates broke open with jackhammers to remove the drugs.

### 3. Goff's Drug-Dealing Activity While Incarcerated

At trial, there was conflicting testimony about Goff's role in the drug operation after his bond was revoked in January 1999. Marshall testified that he and Smith had decided that when they restarted the shipments in 1999 (following the January arrests), they were going "to just keep all of the profit ourselves," (*id.* at 57), that Goff was no longer involved in the operation, and that he and Smith cut Goff out of the profits when Goff went to federal prison. Marshall also testified that he did not tell Goff about the sale of the Prowler, and that Goff only found about the sale when Manka visited Goff in jail. However, Marshall testified that Goff was upset when he learned about the sale of the Prowler, and he paid Goff $25,000 in cash from the sale after the fact. In contrast, Brown testified that Goff instructed Marshall to sell the Prowler, and that Marshall was upset only because he had not yet received the money from the sale. Brown also testified that Goff was not receiving his full share of the cocaine profits while he was incarcerated, which upset Goff and led Goff to

consider trying to cut off Marshall and Smith from the Chicago supplier. Hill testified that Goff continued to receive payments after he went to prison.

Finally, there was testimony presented that after Goff was transferred to a Federal Correctional Institution in West Virginia ("FCI Beckley") in June 1999, he helped smuggle marijuana into the prison for resale. One of his fellow inmates, Marvin Scott, who knew some of Goff's associates in Dayton, approached Goff about selling marijuana. Thereafter, Goff arranged for one of his co-conspirators in Dayton, Dave Scott, to deliver marijuana to the mother of Marvin Scott's child, Valerie Fenton, who then smuggled the marijuana into the prison when she was visiting Marvin Scott. They carried out this operation three times between December 1999 and January 2000 with roughly one ounce of marijuana each time. Dave Scott paid Fenton $1500 for her role, and Marvin Scott and Goff split their profit from the sales of $6000 evenly.

## B. Procedural Background

### 1. 1996 Arrest and Resulting Guilty Plea

On September 25, 1996, as a result of the controlled delivery of cocaine at Charlie's Car Care, Goff was arrested by federal agents in Dayton, Ohio, along with Abela, Valenzuela, and his father, and held in Montgomery County jail. On October 3, 1996, Goff was released on bond. Nearly two years later, on September 1, 1998, Goff pleaded guilty to a single count of conspiracy to distribute and possess with intent to distribute cocaine, based on an indictment filed October 16, 1996. On October 21, 1998, the district court amended Goff's conditions of release, permitting Goff to be away from his mother's home for twelve hours each day. On January 20, 1999, Goff's bond was revoked and he was transferred to Montgomery County jail because he had returned to his

residence late and was beyond his restricted range for several minutes. On March 26, 1999, Goff was sentenced to 188 months in federal prison. Goff was transferred to FCI Beckley on June 25, 1999.

### 2. Grand Jury Case

In 2004, Goff was subpoenaed to testify before a grand jury in the Southern District of Ohio in relation to a drug investigation and refused to answer questions. *See In re Goff*, 112 F. App'x 423, 423 (6th Cir. 2004). On July 8, 2004, the district court ordered Goff to testify, and he again refused, this time invoking his Fifth Amendment right against self-incrimination. *See id.* On July 13, 2004, the district court issued an order granting Goff immunity for his testimony and compelling him to testify, but he still refused. *See id.* The district court found Goff in civil contempt and ordered him incarcerated under the contempt order until he testified or the grand jury term expired. *See id.* at 423-24. Goff appealed, and this Court affirmed the finding of contempt and order of confinement. *See id.* at 424.

### 3. Current Case

On October 12, 2004, a five-count indictment was filed in this case. Goff was not named as a defendant in that indictment, but instead was identified as a previously convicted conspirator. A superseding indictment was filed on December 15, 2004, listing two new counts and several new defendants, including Goff. Goff filed motions to dismiss this indictment on grounds of double jeopardy, expiration of the statute of limitations, and abuse of the grand jury. The district court denied all of these motions on February 20, 2006. On February 28, 2006, the Government filed a second superseding indictment.

Goff appealed the denial of his motions to dismiss to this Court, which on June 27, 2006, affirmed the district court's rejection of his double-jeopardy claim on the merits and found a lack of jurisdiction to hear Goff's claim of grand jury abuse. *See United States v. Goff*, 187 F. App'x 486, 495 (6th Cir. 2006).

Goff's case was scheduled to proceed to trial on September 18, 2006. However, on September 7, 2006, the Government filed a motion to continue, asking the district court to delay the start of trial. The court held a hearing on this motion on September 18, 2006, which Goff did not attend, though his counsel was present. The court granted the motion and scheduled Goff's trial to begin on September 28, 2006.

Goff's case proceeded to trial on that day, and the jury returned a verdict on October 11, 2006, finding Goff guilty on both counts. Goff filed a motion for judgment of acquittal or a new trial; the court denied the motion on October 16, 2007. Goff then filed a second motion for a new trial based on newly discovered evidence; that motion was denied on August 8, 2008. On September 24, 2008, the court sentenced Goff to a term of 360 months in prison, to run consecutive to the 188-month term of imprisonment he already was serving for his guilty plea in the earlier case. Goff now appeals both his convictions and his sentence.

## II. ANALYSIS

### A. Double Jeopardy

The first argument raised by Goff on appeal is that his drug-conspiracy conviction violates the Double Jeopardy Clause. We conclude that this claim fails because Goff cannot demonstrate that

the conspiracy for which he was convicted at trial was the same conspiracy to which he pleaded guilty in 1998.

### 1. Standard of Review

We generally review de novo claims that a defendant's conviction should be vacated because of a double-jeopardy violation. *See United States v. Wheeler*, 535 F.3d 446, 449 (6th Cir. 2008). However, "[o]ur review is more deferential . . . when the issue is whether an indictment charged the same conspiracy for which a defendant was previously tried. The finding that multiple conspiracies existed can be set aside only if it is clearly erroneous." *Goff*, 187 F. App'x at 489; *see also In re Grand Jury Proceedings*, 797 F.2d 1377, 1380-81 (6th Cir. 1986) ("The finding of fact by the lower court that the government had proved by a preponderance of the evidence that multiple conspiracies existed can be set aside only if it is clearly erroneous."). Here, the district court gave the jury specific instructions explaining that one of the factual issues the jury was charged with deciding was whether Goff "entered into a new drug conspiracy following the September 25, 1996 arrest." (R.E. 724, at 115.) Thus, in deciding Goff's double-jeopardy claim, we review legal issues de novo and review for clear error the jury's factual determination that the drug conspiracy alleged in this case was separate from the drug conspiracy to which Goff previously pleaded guilty. "Clear error exists only where we are 'left with the definite and firm conviction that a mistake has been committed.'" *Goff*, 187 F. App'x at 489 (quoting *United States v. Monumental Life Ins. Co.*, 440 F.3d 729, 732 (6th Cir. 2006)).

    *2.* Sinito *Totality-of-the-Circumstances Test*

The Fifth Amendment to the U.S. Constitution states that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This clause "protects against a second prosecution for the same offense after conviction or acquittal, and against multiple punishments for the same offense." *Palazzolo v. Gorcyca*, 244 F.3d 512, 516 (6th Cir. 2001); *see also United States v. Dixon*, 509 U.S. 688, 696 (1993) ("This protection applies both to successive punishments and to successive prosecutions for the same criminal offense."). Normally, courts apply the "same-elements" or *Blockburger* test—which "inquires whether each offense contains an element not contained in the other"—to determine whether two offenses are identical for double-jeopardy purposes. *Dixon*, 509 U.S. at 696. However, we have recognized that double-jeopardy claims regarding conspiracy charges should be treated differently. *See United States v. Sinito*, 723 F.2d 1250, 1256 (6th Cir. 1983). Because conspiracy cases often involve "a host of co-conspirators and a multiplicity of overt acts," there is a risk that "[a]n overzealous prosecutor . . . could choose certain overt acts in one indictment and a different set of overt acts in a second indictment, thereby carving up one conspiracy into two or even more artificial offenses." *Id.* Applying the same-elements test in such a situation would undermine the Double Jeopardy Clause, "since each set of overt acts would require different evidence." *Id.* Thus, we apply a totality-of-the-circumstances test to double-jeopardy claims in the conspiracy context. *Id.* In applying this test, we must consider at least five factors:

> 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the
> indictments; 4) the overt acts charged by the government or any other description of
> the offenses charged which indicates the nature and scope of the activity which the

government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place.

*Id.* "Where several of these factors differ between the conspiracies, the conclusion follows that the alleged illegal conspiracies are separate and distinct offenses." *Id.*

### 3. Discussion

In upholding the denial of Goff's pretrial motion to dismiss on double-jeopardy grounds, this Court concluded that three of the five *Sinito* factors weighed against Goff: time, the identities of the co-conspirators, and the nature and scope of the alleged illegal acts. *See Goff*, 187 F. App'x at 492-93. Goff's double-jeopardy claim, advanced again after trial, fails because, based on the evidence presented at trial, these three factors still favor a finding of two separate and distinct conspiracies. Further, the Government presented evidence at trial that a fourth factor, the location of the conspiracies, weighs against finding a double-jeopardy violation.

The first factor, the alleged time period of the conspiracies, weighs against Goff's position. When Goff pleaded guilty to a single count of conspiracy to distribute and possess with intent to distribute cocaine on September 1, 1998, it was based on his arrest on or about September 25, 1996, when the couriers made the controlled delivery of cocaine to his father's auto shop. The indictment under which he pleaded guilty was filed on October 16, 1996. In the second superseding indictment, upon which Goff was convicted, the Government alleged that the charged drug conspiracy began on or about September 27, 1996, and ended on October 12, 2004. Based solely on the indictments, there was an overlap between the two conspiracies of, at most, just over two weeks. However, the evidence presented at trial was even less favorable to Goff's position. The testimony of Goff's co-

conspirators indicated that the first conspiracy ended when Goff was arrested on September 25, 1996, and the second conspiracy did not begin until sometime shortly after Goff was released on bond on October 3, 1996. Thus, according to this testimony, there was no temporal overlap between the conspiracies whatsoever. Both this testimony and the facts alleged in the indictment militate against a finding that only a single conspiracy existed. *See Wheeler*, 535 F.3d at 456 (determining that the time factor weighed against a double-jeopardy claim where one indictment set forth a drug conspiracy lasting from 1990 to April 2003 and the other indictment set forth a drug conspiracy beginning in 2002 ); *Sinito*, 723 F.2d at 1250, 1257 ("An overlap of ten months is not indicative of one conspiracy."). While the Government did present evidence of Goff's pre-arrest drug-dealing, the testimony presented at trial demonstrated a clear delineation in Goff's pre-arrest and post-arrest drug operations.

The second *Sinito* factor also weighs against finding a double-jeopardy violation. The co-conspirators involved in Goff's operations changed significantly after his arrest. There were various individuals who worked with Goff to sell cocaine during both conspiracies. However, a close examination of their involvement, as well as that of the individuals involved only before or after his arrest, weighs in favor of a finding of two conspiracies. In the first case, Goff was charged along with his father and the two couriers who carried out the controlled delivery. Significantly, not one of these three co-conspirators was charged or alleged to be involved in the second conspiracy. *See Sinito*, 723 F.2d at 1257 ("[The defendant] was the only party charged in both indictments. This fact, of course, lends support to the district court's conclusion there were two conspiracies."). Marshall—who ran the day-to-day operations of the second conspiracy—testified that, prior to

Goff's arrest, he was not a member of a larger conspiracy, he simply purchased cocaine from Goff for resale. Specifically, he stated that before Goff's arrest he "was just a customer," (R.E. 607 at 44), while afterwards he became a partner with Goff and Fred Smith, sharing the profits equally with them and running the day-to-day operations. Marshall testified that, in addition to Goff, Todd "Swifty" Brown and Fred Smith were the only pre-arrest conspirators in the operation that remained a part of the operation after Goff's arrest. The rest of the conspirators either were brought over by Marshall from his previous operations or became involved at a later time. Hill testified that prior to Goff's arrest, he did not have any direct business dealings with Goff. He did describe Marshall as his boss and Goff as Marshall's boss prior to Goff's arrest. However, he later stated that, prior to Goff's arrest, Marshall was just one of Goff's customers. Similarly, Todd Brown testified that from about 1993 until Goff's arrest, Marshall was simply one of Goff's regular customers, paying Goff a fixed amount per kilogram of cocaine. Further, the Government presented testimony from four co-conspirators who had no involvement in the pre-arrest conspiracy—Clarence Parker and Clayton Kendall, who both worked as couriers between Dayton and Chicago starting in 1997, and Marvin Scott and Valerie Fenton, who worked with Goff to smuggle marijuana into FCI Beckley in late 1999 and early 2000. While Goff, Smith, and the Chicago suppliers remained constant, the evidence at trial indicated that the rest of the cast involved in Goff's operation changed after his arrest. *See Sinito*, 723 F.2d at 1257 (holding that two distinct conspiracies can be found "even though they may involve some of the same participants").

The third *Sinito* factor, the statutory charges included in the indictments, does not weigh against Goff. In the first case, Goff pleaded guilty to a cocaine-distribution conspiracy charge, while

the Government dropped a heroin-related charge. In this case, in addition to the cocaine-distribution conspiracy charge, Goff was convicted of conspiring to distribute marijuana in violation of 21 U.S.C. § 841(b)(1)(B)(vii) and conspiring to launder money in violation of 18 U.S.C. § 1956(a)(1)(B)(i). While the addition of the marijuana-related allegations under the same drug-conspiracy count may weigh slightly in favor of distinguishing between the first and second conspiracies, we find it to be of little significance.

The most salient evidence distinguishing the first and second conspiracies falls under the fourth *Sinito* factor. *Cf. Wheeler*, 535 F.3d at 456 (noting that the scope and nature of the conduct charged is the "most significant factor"). Marshall, Hill, and Brown all testified about how the nature, scope, and organization of the operation changed once Goff was released on bond to home confinement and how these changes were predicated on Goff, Marshall, and Smith's entering into a new profit-sharing agreement. Marshall testified that he approached Goff about his need for money shortly after Goff's release on bond, and that he, Goff, and Smith forged a new partnership to transport cocaine from Chicago and sell it in Dayton. Under this new arrangement, the three men split the profits evenly. Brown testified that this agreement was different than their previous agreement because under "[t]heir previous agreement, Earl [Marshall] was just basically paying the normal street price for the cocaine." (R.E. 607, at 113.)

Under this new arrangement, Marshall managed the day-to-day operations of the conspiracy; obtaining locations at which to receive the drug shipments, coordinating the deliveries, and delegating tasks to other conspirators. Meanwhile, Goff became a "[s]ilent partner." (R.E. 607, at 41.) Marshall explained that this meant that Goff "got his share and that was it. He didn't have no

type of hands on with the business, the drug business or nothing." (*Id.*) According to Marshall, prior to Goff's 1996 arrest, Goff was the "leader" of the cocaine business, whereas afterwards he was a "back seat driver." (*Id.* at 41-42.) Similarly, Hill testified that, following Goff's arrest, Goff's role "was a lot different," and Marshall's role changed "dramatically." (R.E. 610, at 107.) Specifically, Goff's "role was basically now like an overseer, you know. He is in charge of [Marshall] and [Marshall] is in charge of me. I'm like the lieutenant." (*Id.* at 102.) Marshall took on this role because, as Hill stated, "[Goff] couldn't get around like he used to anymore. He couldn't see the people that he needed to see . . . . So, therefore he made Earl Marshall his lieutenant to do his foot work for him." (*Id.* at 97.) However, at least at first, Goff maintained contact with the suppliers in Chicago, though this involvement ended as well once Goff's was re-incarcerated. "After he was arrested, . . . Charles [Goff] still had the contact with the people with Fred Smith and Earl [Marshall], so it was all like a three man tag team until . . . Charlie Goff left, which was in like close to '98 is when he gave Earl officially the connect . . . ." (*Id.* at 183.) Goff's delegation of responsibility to Marshall was just one of several ways in which he attempted to insulate himself from the distribution operations. For instance, both Marshall and Hill testified about communicating with Goff about the cocaine business by writing notes back and forth while they visited him on house arrest because he feared that his ankle bracelet was bugged. In sum, the evidence presented at trial showed a dramatic change in the nature of Goff's cocaine-distribution operations after his arrest.

Finally, in regards to the last *Sinito* factor, while the pre-arrest and post-arrest conspiracies both involved shipping drugs from Chicago to Dayton, the conspirators specifically shifted the location where they received the cocaine following Goff's arrest—from Charlie's Car Care to the

Broadway Street warehouse—because the previous location had been compromised. (They later changed locations again—to the Diamond Mill Road property—after the arrests of Kendall and others.)

In sum, four of the five *Sinito* factors clearly weigh in favor of finding no double-jeopardy violation. Nonetheless, Goff argues that this case is analogous to *United States v. Mann*, 195 F. App'x 430 (6th Cir. 2006), where this Court determined that two methamphetamine-related conspiracy charges charged in an indictment were multiplicitous. *See id.* at 434. However, in that case, four of the five *Sinito* factors weighed in favor of finding a *single* conspiracy. *Id.* at 434-35. Similar to the present case, the Government in *Mann* alleged that a new conspiracy began after the defendant was released from a months-long term of imprisonment. *Id at 435.* However, the defendant in that case had been imprisoned for "an unrelated offense," and this gap in time was the only factor possibly distinguishing the two alleged conspiracies. *Id.* Goff also relies upon *United States v. Beard*, 318 F. App'x 323 (6th Cir. 2008), where the defendant alleged that there was a material variance between his indictment and the conduct proved at trial because in the middle of the conspiracy he served a six-year prison term. *Id.* at 324-25. In rejecting this argument, this Court noted that the "[t]he continuity of distributors, customers, location, and the unique dual packaging of heroin and cocaine bindles over the course of approximately two decades supports the jury's finding of a single conspiracy." *Id.* at 325. The fact that, in other situations, we have found that certain conspiracies continued to operate while some of the participants are incarcerated does not help Goff given the specific facts of his case. Goff's attempts to analogize to *Mann* and *Beard* are

unavailing because of the extensive testimony at trial about how he, Smith, and Marshall entered into a new partnership to distribute drugs after he was released on bond.

Moreover, Goff's double-jeopardy arguments fail in a more fundamental way. Even if timing were the only factor distinguishing the first and second conspiracies, Goff's claim would fail because the basic allegation set forth in this case is that Goff continued to conspire to sell illicit drugs *after* he was arrested and indicted in 1996, and even after he was convicted, sentenced, and incarcerated based on that indictment. As the Government argues, a finding that Goff could not be convicted in this case because of double-jeopardy concerns "would amount to an unwarranted grant of immunity" to Goff for the illegal drug-dealing activity he engaged in after the first indictment. (Gov't Br. 22.) As recognized by this Court in *Sinito*, the nature of conspiracies as ongoing operations involving multiple parties can complicate the application of double-jeopardy principles. *See Sinito*, 723 F.2d at 1256. However, the testimony at trial indicated that Goff was engaged in a drug-dealing conspiracy even after he was sentenced and incarcerated. It would have been impossible for the Government to charge Goff in the first case for his post-indictment, post-incarceration acts related to drug distribution. Allowing him to escape prosecution for these acts simply because some characteristics of the conspiracy were the same as those of the conspiracy in which he previously was engaged would be an unreasonable extension of the Double Jeopardy Clause. Thus, we conclude that Goff's double-jeopardy claim fails.

**B. Fatal Variance**

In the alternative to his double-jeopardy argument, Goff argues that his drug-conspiracy conviction should be reversed because the Government presented evidence of multiple conspiracies

that were used impermissibly by the jury to convict him. Goff argues that the Government presented evidence of three drug-related conspiracies that were separate from the drug conspiracy charged in the indictment: (1) Todd Brown and Goff's operations selling drugs together while they were in high school, (2) the scheme to sell marijuana in FCI Beckley, and (3) the cocaine-distribution conspiracy for the period of time after Marshall decided to stop sharing profits with Goff. We conclude that the first argument fails because Goff cannot demonstrate that the variance resulted in prejudice and the second and third arguments fail because Goff cannot demonstrate a variance.

### 1. Standard of Review

Generally, we review de novo a defendant's claim that there was a prejudicial variance between the terms charged in the indictment and the evidence presented at trial. *United States v. Warman*, 578 F.3d 320, 341 (6th Cir. 2009). However, because Goff failed to raise this claim before the district court, we review it only for plain error. *See United States v. Caver*, 470 F.3d 220, 235 (6th Cir. 2006). "To demonstrate plain error, a defendant must show (1) an error, (2) that is plain, and (3) that affects substantial rights." *United States v. Hettinger*, 242 F. App'x 287, 293 (6th Cir. 2007) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)). Finally, when a plain error is shown, it is within our discretion to correct it, and we do not exercise that discretion "unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732 (internal quotation marks and brackets omitted).

### 2. Standard for Fatal-Variance Claims

"A variance occurs when the charging terms of the indictment are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *United*

*States v. Bearden*, 274 F.3d 1031, 1039 (6th Cir. 2001) (internal quotation marks and brackets

omitted).

> Within the context of a conspiracy, a variance constitutes reversible error only if a defendant demonstrates that he was prejudiced by the variance and that the indictment alleged one conspiracy, but the evidence can reasonably be construed *only* as supporting a finding of multiple conspiracies. In making this determination, the evidence must be viewed in the light most favorable to the government.

*Caver*, 470 F.3d at 235-36 (internal quotation marks, brackets, and citation omitted). "Therefore,

to obtain a reversal of his conviction based on a variance, a defendant must (1) demonstrate the

variance, and (2) show that the variance affected a substantial right." *Warman*, 578 F.3d at 341.

Under the first prong, whether the evidence showed a single or multiple conspiracies

generally is a question of fact to be determined by the jury. *United States v. Hughes*, 505 F.3d 578,

587 (6th Cir. 2007). "'The principal considerations in determining the number of conspiracies are

the existence of a common goal, the nature of the scheme, and the overlapping of the participants

in various dealings.'" *Id.* (quoting *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003)).

"Where the evidence demonstrates only multiple conspiracies, a defendant is prejudiced if

the error of trying multiple conspiracies under a single indictment substantially influenced the

outcome of the trial." *Caver*, 470 F.3d at 237 (citing *Kotteakos v. United States*, 238 U.S. 750, 765

(1956)); *see also Hughes*, 505 F.3d at 587 ("To demonstrate substantial prejudice, the appellant must

show that the variance prejudiced his ability to defend himself or prejudiced the overall fairness of

the trial."). The primary risk that the variance doctrine is designed to alleviate is guilt

transference—"that the appellant was convicted based on evidence of a conspiracy in which the

appellant did not participate." *Hughes*, 505 F.3d at 587. "This risk increases in direct proportion

to the number of defendants, and the number of conspiracies demonstrated at trial." *Caver*, 470 F.3d at 237. Even where a defendant shows that there was a variance that resulted in guilt transference, "typically any danger of prejudice can be cured with a cautionary instruction to the jury that if it finds multiple conspiracies, it cannot use evidence relating to one conspiracy in determining another conspiracy." *Hughes*, 505 F.3d at 587. However, the ability of limiting jury instructions to cure such a defect decreases as the amount of evidence unrelated to the defendant's conduct or the conspiracy in which the defendant participated increases. *Id.*

   *3. Discussion*

   The first of Goff's variance arguments that we address corresponds directly to his double-jeopardy argument because it deals with the delineation between his drug-dealing activities before and after the starting date of the drug conspiracy alleged in the second superseding indictment. Goff argues that Todd Brown's testimony about selling relatively small amounts of crack cocaine and heroin with Goff in the late 1980s and early 1990s resulted in a fatal variance. Brown testified that he and Goff began selling crack cocaine together during high school, when they were around sixteen or seventeen years old. Within a year or two, they began buying powder cocaine directly, cooking it into crack, and then selling the crack. After a few months, they started selling heroin together, along with Goff's father. Brown testified that twice during this period, he accompanied Goff to the Chicago metropolitan area to pick up heroin from their supplier. The Government contends that this evidence did not create a variance because it was introduced only to show that Goff had the requisite knowledge and intent to carry out the crimes included in the indictment and because these activities clearly were separate from the charged drug conspiracy. Indeed, unless the Government were to

concede Goff's double-jeopardy claim, this testimony from Brown must be evidence of a separate

drug conspiracy. Similarly, all of the other testimony about Goff's drug-trafficking activities prior

to his 1996 arrest were evidence of separate conspiracies.

While this testimony therefore creates a variance, Goff is not entitled to a reversal of his

conviction because he cannot show prejudice. As we have noted, guilt transference is the primary

risk created by a variance. *Caver*, 470 F.3d at 237. Goff cannot demonstrate guilt transference in

regards to the evidence of the pre-arrest drug-trafficking conspiracies because it is not disputed that

he was an integral participant in these other conspiracies. *See Hughes*, 505 F.3d at 587 (defining

guilt transference as a defendant being "convicted based on evidence of a conspiracy in which [he]

did not participate); *Caver*, 470 F.3d at 237 (describing the risk as "the transference of guilt from

defendants involved in one conspiracy to defendants in another conspiracy"). Nor can Goff

demonstrate other recognized forms of prejudice. For example, Goff makes no argument that he was

surprised by the introduction of this evidence at trial. *See United States v. Swafford*, 512 F.3d 833,

842 (6th Cir. 2008). Indeed, Goff has attempted to use the pre-arrest evidence to support his double-

jeopardy claim throughout these proceedings. Goff also cannot demonstrate that he was prejudiced

by "spillover" caused by the presence of a large number of defendants or evidence from a large

number of conspiracies—he was the only defendant being tried, he was a participant in all of the

drug conspiracies discussed, and the different conspiracies were clearly delineated chronologically.

*See id.* at 843.

Further, as the Government notes, the district court gave limiting instructions to the jury to

avoid any possible prejudice based on a variance. Specifically, the court instructed jurors that "[i]f

you find that the defendant was not a member of the drug conspiracy charged in Count 1 of the indictment, then you must find the defendant not guilty of Count 1 even though the defendant may have been a member of some other drug conspiracy." (R.E. 724, at 104-05.) If the variance had resulted in any prejudice, it would have been cured by these limiting instructions. *See Hughes*, 505 F.3d at 587 ("[T]ypically any danger of prejudice can be cured with a cautionary instruction to the jury that if it finds multiple conspiracies, it cannot use evidence relating to one conspiracy in determining another conspiracy.")

Goff presents two additional variance arguments, but both fail because he is unable to demonstrate a variance on either claim. Goff's second variance argument is that Marshall's attempt to stop sharing profits with Goff after Goff went to federal prison ended one conspiracy and started a new conspiracy in which Goff was not involved. Thus, any evidence presented by the Government about the conspiracy's activities after Marshall allegedly cut Goff out created a fatal variance. This argument fails for two reasons. First, multiple witnesses testified about Goff's active involvement in the drug-trafficking conspiracy after he went to federal prison and Marshall allegedly cut him out of the profits. It is true that Marshall testified that after the January 1999 arrests in Chicago and the revocation of Goff's bond, he and Smith decided that when they started back up, they were going "to just keep all of the profit ourselves." (R. 607, at 57.) Further, Marshall testified that they cut Goff out of the operation when he went to prison. However, Marshall's testimony on this point was undercut by other evidence. For instance, Tico Hill testified that Goff continued to receive payments from the organization after he went to FCI Beckley. Even more significant in this regard was Marvin Scott's testimony about how he and Goff worked together to sell marijuana when they were in FCI

Beckley from late 1999 until early 2000. Though she had no direct contact with Goff, Valerie Fenton's testimony corroborated this account and linked the FCI Beckley activities to the larger conspiracy. She testified that Dave Scott, whom she knew only as "Little Dave," supplied her with marijuana to smuggle into FCI Beckley on three occasions. Given this testimony about Goff's continued involvement after he entered FCI Beckley, it cannot be said that the evidence at trial could be "construed *only* as supporting a finding of multiple conspiracies," especially under the plain-error standard. *Caver*, 470 F.3d at 236 (internal quotation marks omitted).

Second, even if the evidence were clear that Marshall successfully cut Goff out of his share of the conspiracy's profits, this fact would not be legally sufficient to terminate Goff's role in the conspiracy. In order for Goff to establish that he withdrew from the conspiracy, he is required to show that there was more than "a 'mere cessation of his activity.'" *United States v. Cox*, 565 F.3d 1013, 1016 (6th Cir. 2009) (quoting *United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir. 1991)). Rather, to establish his withdrawal he must demonstrate that he took "'affirmative action to defeat or disavow the purpose of the conspiracy.'" *Id.* (quoting *Lash*, 937 F.2d at 1083); *see also Brown v. United States*, 261 F. App'x 865, 867 (6th Cir. 2008) ("[T]here is no evidence that [the habeas petitioner] informed his co-conspirators that he was quitting the ongoing drug-trafficking activities of the group, which is what is required to establish effective withdrawal from a conspiracy.").

Far from indicating that Goff actively withdrew from the conspiracy, the evidence presented at trial indicated that Goff either was unaware of Marshall's attempts to exclude him or actively was trying to maintain his role in the operation. Indeed, Marshall testified that he and Smith avoided telling Goff about their plan to cut him out of the profits. When Marshall visited Goff at FCI

Beckley, Goff asked him about the business and Marshall misled him into thinking that the shipments had not yet restarted after the January 1999 arrests in Chicago. Consistent with this testimony, Todd Brown testified that when he spoke with Goff on the phone while Goff was at FCI Beckley, Goff "was upset because he said that he wasn't getting his full amount of money off of the cocaine proceeds. That it was coming up short and he was wanting to know exactly how much cocaine was coming in per week." (R.E. 601, at 147.) Brown stated that Goff threatened to contact the suppliers in Chicago to tell them to cut Marshall off and put Dave Scott and Fred Smith in charge of the operation instead. While Goff was unsuccessful in cutting Marshall off from the suppliers, Brown testified that after Goff had been at FCI Beckley for about a year, Dave Scott, Fred Smith, and Goff began to receive shipments of cocaine independent from Marshall. Given this evidence of Goff's continued role and the lack of any evidence indicating that Goff affirmatively acted to defeat or disavow the purpose of the conspiracy, he cannot show that he withdrew from the conspiracy, *see Lash*, 937 F.2d at 1083, let alone demonstrate that the conspiracy ended altogether. Thus, because Goff cannot demonstrate two separate conspiracies, his first variance argument fails, and we need not address whether he could demonstrate prejudice.

Goff's third variance argument is that the conspiracy to distribute marijuana within FCI Beckley was separate and distinct from the conspiracy he was charged in the indictment because it "involved different participants, had a different structure, was at a different location, was distinct in time, and had a different compensation scheme." (Goff Br. 17.) This argument is unavailing. First, in addition to the cocaine-related allegations, Count One of the second superseding indictment explicitly alleged that Goff conspired to "knowingly, intentionally and unlawfully distribute and

possess with intent to distribute . . . in excess of 100 kilograms of marijuana." (R.E. 360, at 2.) While Count One of the indictment did not specifically address the FCI Beckley activities, it stated that "[i]t was part of the conspiracy that members of the conspiracy would arrange for . . . marijuana to be delivered to the Southern District of Ohio," and that Goff and others "distributed . . . marijuana in the Southern District of Ohio for profit." (*Id.* at 3-4.)

Goff is correct in pointing out that the FCI Beckley operation was carried out, in large measure, in a different location and featured two conspirators not involved in the other aspects of the conspiracy—Valerie Fenton and Marvin Scott. However, it shared the common goal of distributing marijuana, and the two other people involved—Goff and Dave Scott—overlapped significantly with the other aspects of the conspiracy. Marvin Scott testified that, while they were both housed at FCI Beckley, Goff accepted his proposition to sell marijuana smuggled into the prison by Fenton, and that Goff identified Dave Scott as the person who would supply the marijuana to Fenton. Todd Brown testified that Dave Scott still answered directly to Goff, even when Goff was on house arrest and incarcerated. Fenton testified that Dave Scott—whom she knew as "Little Dave"—delivered marijuana to her house in Dayton to transport to Marvin Scott in prison on three occasions. Tico Hill testified that, in 1999, the conspirators received a shipment of 1000 pounds of marijuana at the Diamond Mill Road property from their suppliers in Chicago, hidden in a concrete barrier in the same manner they usually received cocaine.[2] He further testified that the marijuana was distributed in the same manner in which the conspirators normally distributed cocaine, and that

---

[2]Todd Brown also testified about receiving this shipment of marijuana, but he estimated the weight to be roughly 600 pounds.

roughly five to ten pounds of the marijuana was given to Dave Scott to distribute. Thus, in sum, the

evidence presented at trial indicated that, in 1999, Goff's co-conspirators in Dayton received a large

amount of marijuana from Goff's suppliers in Chicago; Dave Scott was given five to ten pounds of

this marijuana; Dave Scott delivered roughly one ounce of marijuana to Fenton's house in Dayton

on three occasions sometime thereafter; Fenton then smuggled this marijuana into FCI Beckley in

December 1999 and January 2000; and, finally, Marvin Scott sold this marijuana in the prison,

sharing the profits with Goff as they previously had agreed. This evidence reasonably could be

construed as supporting a finding of a single conspiracy, and thus there is no variance. *See Caver*,

470 F.3d at 236. Therefore, we again need not address whether Goff could show prejudice.

Based on this analysis, we conclude that Goff's fatal-variance claims fail.

**C. Newly Discovered Evidence**

Goff's third argument on appeal is that he is entitled to a new trial based on a book written

by Earl Marshall that was discovered after his trial. We conclude that the district court did not err

in denying Goff a new trial based on this evidence because it was, at best, merely impeaching of

Marshall's testimony and would not likely result an acquittal if it were presented to a jury.

*1. Standard of Review*

We review a district court's decision regarding a motion for a new trial filed pursuant to

Federal Rule of Criminal Procedure 33 for abuse of discretion.[3] *United States v. Carson*, 560 F.3d

---

[3]Goff styled his motion for a new trial based on newly discovered evidence as a motion under Federal Rule of Criminal Procedure 32(b)(1). In denying the motion, the district court noted that the motion should have been filed pursuant to Federal Rule of Criminal Procedure 33 and analyzed Goff's claims as if it had been. We adopt the same approach.

566, 585 (6th Cir. 2009).  A district court abuses its discretion "when it 'applies the wrong legal

standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.'"

*United States v. Turns*, 198 F.3d 584, 586 (6th Cir. 2000) (quoting *Schachner v. Blue Cross & Blue*

*Shield of Ohio*, 77 F.3d 889, 895 (6th Cir. 1996)).

> *2.  Standard for Granting a New Trial Based on Newly Discovered Evidence*

"Motions for a new trial based upon newly discovered evidence are disfavored and should

be granted with caution." *Id.*  A district judge exercises discretion in considering such a motion and

"may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence."

*Hughes*, 505 F.3d at 593.

> In order to prevail on a Rule 33 motion for a new trial, a defendant must show the
> following: "(1) the new evidence was discovered after the trial; (2) the evidence
> could not have been discovered earlier with due diligence; (3) the evidence is
> material and not merely cumulative or impeaching; and (4) the evidence would likely
> produce acquittal."

*Carson*, 560 F.3d at 585 (quoting *United States v. Seago*, 930 F.2d 482, 488 (6th Cir. 1991)).

> *3.  Discussion*

The new evidence that Goff presented in support of his motion was a book written by Earl

Marshall which depicts Marshall's life as a drug dealer.  Goff argues that, had the court received this

book in evidence, the jurors would have been made aware of inconsistencies between the book and

Marshall's testimony, which would have discredited Marshall's testimony and resulted in an

acquittal.  Specifically, Goff emphasizes that he "is not named in the book."  (Goff Br. 20.)

In opposition to Goff's motion, the Government produced an affidavit from Marshall in

which he stated that the character "Lil C More"or "Little C-More" in the book was "a fictional

character based loosely upon Charlie Goff, Jr." (R.E. 694, Attachment #1, at 1.) Further, Marshall stated that, although the book "purports to be a biography of my life," the events detailing his drug-dealing are "largely fictional and [contain] gross embellishments designed strictly to increase potential book sales." (R.E. 694, Attachment #1, at 1.) He stated that it "was more akin to a fictional comic book or 'urban novel,' as opposed to a serious piece of non-fiction." (*Id.*)

Goff's newly discovered evidence is, at best, merely impeaching of Marshall's testimony. In fact, in light of Marshall's affidavit, the evidence could be viewed as either corroborative or impeaching. On one hand, the passages on Lil C More bear striking resemblance to Marshall's testimony regarding his dealings with Goff; recounting how the two met as marijuana dealers and how Lil C More's father owned an auto-detail shop on North Kilmer Street, how Lil C More first supplied Marshall with cocaine at this auto shop and introduced him to "Swifty," and how Lil C More was arrested for attempting to buy fifty kilograms of cocaine from a supplier in Chicago on September 25, 1996, after the cocaine was discovered by police in a secret compartment in the couriers' vehicle. This would tend to corroborate Marshall's testimony. On the other hand, because of this striking similarity, the fact that Marshall's affidavit states that the book contains exaggerations also could lead jurors to suspect that Marshall's testimony was exaggerated, which would have some impeachment value. Ultimately, the book's impeachment value likely would have been limited by its corroborative value. Moreover, although Marshall was an important witness, he was only one of many who testified against Goff. Thus, we conclude that Goff cannot satisfy the third and fourth prongs of the test because the new evidence would have been merely impeaching, at best, and would not likely have resulted in an acquittal. *See Carson*, 560 F.3d at 585.

**D. Goff's Absence at Pretrial Hearing**

Goff's fourth argument on appeal is that his constitutional rights were violated when the district court held a pre-trial hearing without his being physically present in the courtroom, although his attorney was present. This claim fails because Goff has not shown that the hearing was critical to the outcome of his case nor that his presence would have contributed to the fairness of the hearing.

*1. Standard of Review*

The parties agree that we review this claim for plain error because Goff did not raise it at trial. *See United States v. Paul*, 57 F. App'x 597, 602, 604-05 (6th Cir. 2003) (applying plain-error review to claim based on judge's *ex parte* communications with jurors); *see also Olano*, 507 U.S. at 732.

*2. Discussion*

Goff argues that his conviction should be overturned because he was not physically present at his final pre-trial conference, in violation of his Sixth Amendment and Speedy Trial rights. "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). Indeed, "[a] defendant's right to be physically present at every stage of his trial has a longstanding tradition in this country's criminal jurisprudence, with roots in both the Due Process Clause and the Confrontation Clause of the Sixth Amendment." *Gray v. Moore*, 520 F.3d 616, 622 (6th Cir. 2008) (citations omitted). "[E]ven in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the

fulness of his opportunity to defend against the charge.'" *Stincer*, 482 U.S. at 745 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934)).

On September 18, 2006, the district court held a hearing to consider the Government's motion to continue Goff's trial, which had been scheduled to commence that day. Goff's counsel and an Assistant U.S. Attorney were present, but Goff was not. At the hearing, the court noted that it had dispatched U.S. Marshals to retrieve Goff, but he apparently "was refusing to attend." (R.E. 721, at 2.) Goff's counsel stated that he did not realize that the court wanted Goff to attend the hearing and that, when he had spoken with Goff on the phone earlier that morning, he told Goff that he did not know of any reason for Goff to attend the hearing. The court stated that it had wanted Goff to attend the hearing, but that it would not require him to be present. Goff's counsel did not object to the motion, stating only that Goff "want[ed] the case to go to trial." (*Id.* at 4.) The court granted the Government's motion and rescheduled the trial to begin ten days later.

At the beginning of Goff's trial on the scheduled date, Goff's counsel raised the issue of Goff's absence at the previous hearing. Goff's counsel explained that Goff's absence was not due to a refusal to attend, but because of a misunderstanding between Goff and the U.S. Marshal dispatched to pick him up over whether Goff was the prisoner needed in court. Goff never objected to the court proceeding conducted in his absence or to the court's rescheduling of the trial. Rather, Goff's counsel apparently raised the issue only to ensure that the court understood that Goff's absence was not based on a refusal to attend, which the court acknowledged.

Although Goff characterizes the hearing as being "at the beginning of the trial process," (Goff Br. 22), it was not part of the trial, which did not start until ten days later. Thus, this does not

- 30 -

implicate Goff's right "to be physically present at every stage of his trial." *Gray*, 520 F.3d at 622. Rather, the question to be determined is whether the hearing was "critical" to the outcome of Goff's criminal case and whether his presence would have "contribute[d] to the fairness of the procedure." *Stincer*, 482 U.S. at 745. Goff has not made such a showing.

Goff chiefly relies upon *United States v. Barnwell*, 477 F.3d 844 (6th Cir. 2007), where this Court found that the defendant's constitutional right to be present had been violated. *Id.* at 852-53. However, the due process violations in *Barnwell* are not at all comparable to the alleged violation here. The *Barnwell* defendant's convictions were reversed because the trial court had multiple *ex parte* conversations with prosecutors and multiple *in camera* meetings with the jury foreperson during the jury's deliberations, without notifying the defendant or his counsel. *Id.* The other cases cited by Goff are no more helpful to his position. *See Gray*, 520 F.3d at 627-29 (holding that a state court's failure to warn a defendant of possible consequences of continued misbehavior prior to removing him from the courtroom while adverse witnesses were testifying entitled him to habeas relief on one of his convictions); *Paul*, 57 F. App'x at 604-05 (holding that *ex parte* communications between the judge and jurors during the trial did not affect the defendant's substantial rights); *United States v. Riddle*, 249 F.3d 529, 533-35 (6th Cir. 2001) (holding that there is no need for an on-the-record colloquy with a defendant to ensure that the waiver of his or her right to be present during voir dire is knowing and intelligent).

Goff has not set forth any substantive reason for why this hearing was critical to the outcome of his case nor how he was prejudiced by not attending. Indeed, he does not even allege that he would have objected to the continuance of the trial had he been present. *See Stincer*, 482 U.S. at 747

(determining that defendant's constitutional claim failed because there was "no indication that respondent could have done anything had he been at the hearing nor would he have gained anything by attending" (internal quotation marks and brackets omitted)). Moreover, he provides no explanation or support for his allegation that his Speedy Trial rights were violated. Accordingly, we conclude that the district court did not plainly err in conducting the continuance hearing in Goff's absence. *Cf. Coleman v. Ohio Rehab. Servs. Comm'n*, 42 F. App'x 733, 733-34 (6th Cir. 2002) (affirming denial of habeas petition because a state court's determination that a continuance hearing was not a critical stage of the proceedings was not contrary to clearly established federal law).

**E. Sufficiency of Evidence on Money-Laundering Conspiracy Charge**

Goff's fifth argument on appeal is that the Government did not present sufficient evidence to support his conviction for conspiring to launder money. A review of the evidence presented at trial—specifically the evidence concerning the purchase and sale of the Plymouth Prowler and the related purchase of the Diamond Mill Road property—reveals that there was sufficient evidence to convict Goff on this charge.

*1. Standard of Review*

We review de novo claims that there was insufficient evidence presented to sustain a conviction. *United States v. Gunter*, 551 F.3d 472, 482 (6th Cir. 2009). In evaluating such a claim, "[t]he relevant question on appeal is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Warman*, 578 F.3d at 332 (quoting *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005)); *see also Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In making this

determination, we do not weigh the evidence presented at trial, make credibility determinations, or

substitute our judgment for that of the jury. *Warman*, 578 F.3d at 332. Further, "circumstantial

evidence alone can sustain a guilty verdict, and it need not remove every reasonable hypothesis

except that of guilt." *United States v. Martinez*, 588 F.3d 301, 314 (6th Cir. 2009) (internal

quotation marks and brackets omitted). "This standard is a great obstacle to overcome and presents

the appellant in a criminal case with a very heavy burden." *Hughes*, 505 F.3d at 592 (citation

omitted).

## 2. Elements of Conspiracy to Launder Money

Count Two of the second superseding indictment charged Goff with conspiracy to commit

money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and (h). A violation of

§ 1956(a)(1)(B)(i) consists of three elements:

> "(1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds
> are proceeds of unlawful activity; and (3) conduct[ing] or [an] attempt to conduct a
> financial transaction, knowing that the transaction is designed in whole or in part to
> disguise the . . . source, ownership or control of the proceeds."

*United States v. Marshall*, 248 F.3d 525, 538 (6th Cir. 2001) (quoting *United States v. Prince*, 214

F.3d 740, 747 (6th Cir. 2000)). Section 1956(h) criminalizes conspiracies to commit any money-

laundering offense under § 1956. In order to convict a defendant of conspiracy to commit money

laundering under § 1956, the Government is required to prove "(1) that two or more persons

conspired to commit the crime of money laundering, and (2) that the defendant knowingly and

voluntarily joined the conspiracy." *United States v. Garcia*, 259 F. App'x 747, 750 (6th Cir. 2008).

In doing so, the Government is not required to prove that Goff committed an overt act in furtherance

of the conspiracy. *See Whitfield v. United States*, 543 U.S. 209, 214 (2005) (holding that "the Government need not prove an overt act to obtain a conviction" under § 1956(h)); *United States v. Musick*, 291 F. App'x 706, 715 (6th Cir. 2008) (noting that no overt act must be proved under *Whitfield*); *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006) (same). *But see United States v. White*, 492 F.3d 380, 397 (6th Cir. 2007) (noting an over-act requirement). Rather, the Government needed only to prove that Goff "agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment." *Hynes*, 467 F.3d at 964.

### 3. Discussion

At trial, the Government presented substantial evidence regarding the purchase and sale of the Plymouth Prowler and the related purchase of the Diamond Mill Road property. Jerry Manka, a former car dealer, testified that he bought the Prowler for Goff in 1998 at an auction. Goff then paid Manka the $44,000 purchase price in cash installments, including one payment of $25,000. On April 22, 1999, at Marshall's request, Manka sold the Prowler at an auction for $41,588, and then several days later gave Marshall a $41,000 check made out to Marshall's title company. Throughout this time, the title to the Plymouth Prowler remained in Manka's company's name. Patricia Uihlein, the operations manager at Manka's bank, testified about three cash deposits totaling $44,000 deposited into Manka's account in December 1998, around the time the Prowler was purchased. She also testified about a deposit of $41,588 into his account on April 22, 1999, and a $41,000 check drawn from the account from Manka to West End Auto Sales five days later. These transactions

coincide with when Manka allegedly sold the Prowler for Marshall. The Government also presented corroborating testimony from employees of the auctions where Manka bought and sold the Prowler.

Brown testified that, while Goff was on home confinement, he stored the Prowler for Goff at his house for about three weeks "because [Goff] wanted to keep it away from the eyes of the Feds. He didn't want them to know the car was there, you know at, the house or that he purchased the car . . . [b]ecause it was purchased with drug money and he was on house arrest." (R.E. 601, at 125.) Similarly, Marshall testified that he stored the Prowler for Goff for a couple of months. Brown also testified that it was common practice for the conspirators "to transfer [a] car to someone else[']s name so the authorities wouldn't find out the true owner. It was also a common practice that we used to leave the car in the dealership's name . . . ." (*Id.* at 134.)

Marshall testified at trial that he obtained the property on Diamond Mill Road as a new location to receive drug shipments. He further testified that he instructed Manka to sell Goff's Prowler in order to provide part of the down payment on the property. According to Marshall, he did not tell Goff about the sale, but Goff found out about the sale from Manka. (In contrast, Brown testified that Goff instructed Marshall to sell the Prowler.) Marshall testified that Goff confronted him about the sale of the car while he was visiting Goff in jail, and he explained to Goff why he sold the car and "assured [Goff] [he] was going to pay [Goff] his money back." (R.E. 607, at 78.) Although the two originally contemplated Marshall's repaying Goff by fraudulently helping Goff's mother purchase a house, instead Marshall simply paid Goff $25,000 in cash through Dave Scott. Further, Marshall testified that the title to the Diamond Mill Road property originally was placed in Tico Hill's name because Hill could secure a loan, but later was transferred to Clarence Parker's

name in order to "conceal the identity of the owner of the property." (*Id.* at 40.) Finally, Hill testified that "[a]ll of the money" used to purchase the Diamond Mill Road property "was drug proceeds." (R.E. 610, at 147.)

Based on this testimony, a reasonable factfinder could conclude that Goff purchased the Prowler with proceeds that he knew came from illegal drug activity. Further, because Goff conducted the transaction in cash and never transferred the title to his name, a reasonable factfinder could conclude that at least one of the purposes of the transaction was to disguise the source of the proceeds. Further, a reasonable factfinder could conclude that Goff was one of a number of people who conspired to use drug proceeds (including drug proceeds by way of the sale of the Prowler) to purchase the Diamond Mill Road property and attempted to conceal the source or ownership of the property by placing the title in Parker's name. Even if Marshall's testimony that Goff did not know about the sale of the Prowler before it happened is credited over Brown's testimony to the contrary, there is still evidence that Goff used drug money to purchase the Prowler through Manka, entrusted the car to Marshall and Brown to store for him, and received proceeds of the Prowler sale with knowledge that the sale was conducted to purchase the Diamond Mill Road property. Together, this evidence is sufficient to sustain Goff's conviction.

Moreover, in addition to the testimony about the Prowler and the Diamond Mill Road property, there was additional, if somewhat tangential, testimony from both Marshall and Brown about other transactions carried out by Goff that support a conclusion that he conspired to launder money. Brown testified that Goff "often said he had [o]ne [m]illion [d]ollars that he needed to spend [while he was] on house arrest." (R.E. 601, at 141.) According to Brown, Goff purchased a number

of real-estate properties while he was on house arrest through straw purchasers, including a used car lot and a duplex. In addition to the Prowler, Brown testified that Goff purchased several other cars while he was on house arrest, including a Dodge Viper, a Lincoln limousine, a 1998 Corvette convertible that cost $50,000, and a custom Excalibur "kit" car that Brown estimated cost $35,000. Brown also stated that Goff purchased several cars from him, including a 1990 or 1991 Corvette convertible for $13,000, a 1990 BMW for $7500, a Cadillac Seville for $4000, and a red sports utility vehicle for $6000. Further, Brown testified that Goff bought a large amount of jewelry while he was on house arrest, including a Rolex watch that Goff said cost $60,000 and a diamond ring that Goff stated cost $40,000 or $50,000. Brown stated that Goff also had between forty and fifty tailored suits made for himself while he was on house arrest, for $1000 each. Similarly, Marshall testified that at one point while Goff was on house arrest, he brought Goff $22,000 in cash to pay for custom suits. Marshall stated that Goff called him and told him that he needed his share of the money to pay for the suits, and Marshall brought him the money that came from the drug sales to buy the suits. Finally, Brown testified that it was "common knowledge" that all of Goff's money was from drug proceeds, and that the only legitimate job that Goff had ever held was working at a Wendy's restaurant while he was in high school. (*Id.* at 143.)

Goff's attempt to liken his case to *Marshall*, where this Court set aside the defendant's convictions on three counts of money laundering under § 1956(a)(1)(B)(i), *see Marshall*, 248 F.3d at 538-42, is unavailing. In that case, the defendant was convicted of money laundering based on his purchase of a Rolex watch, a tennis bracelet, and expensive wine from proceeds that he stole from a bank. *Id.* at 538. The case turned on whether the evidence satisfied the third element of the

§ 1956(a)(1)(B)(i) test—conducting the transactions with the purpose of disguising the source of the proceeds. *Id.* This Court noted that "[t]he 'most obvious type' of evidence that would support a finding of intent to disguise the proceeds of unlawful activity is 'that of employing a third party in order to conceal the defendant's identity from others.'" *Id.* at 539 (quoting *United States v. Lovett*, 964 F.2d 1029, 1034 n.3 (10th Cir. 1992)). Other types of evidence that could support such a finding include:

> statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction, or expert testimony on practices of criminals.

*Id.* (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1475-76 (10th Cir. 1994)). The *Marshall* defendant's convictions were set aside because the only direct evidence to support the allegation that he made these purchases in order to disguise the source of the money was a false statement he made to someone unrelated to the purchase that he had received the watch as a gift. *Id.* at 539, 542. This Court rejected the argument that the nature of the items themselves—as potential investments—was evidence of money laundering, and noted that the purchases were made by the defendant in person using credit cards in his own name. *Id.* at 541.

In contrast to *Marshall*, Goff's transactions bear numerous indications of concealment: the Prowler title was never transferred into Goff's name, which Brown testified was a common practice amongst the conspirators to conceal the identity of the owner; Goff asked Brown to store the vehicle to hide it from law enforcement officials; the vehicle was bought and sold through a third party and

paid for in cash; and the proceeds of the sale were used to purchase real estate in someone else's name. Goff's comparison to *Marshall* would be more apt if the only support for his conviction were his purchases of expensive clothes, jewelry, and cars. However, the circumstances surrounding the purchase and sale of the Prowler and the purchase of the Diamond Mill Road property distinguish this case from *Marshall*. Accordingly, we conclude that there was sufficient evidence presented at trial to convict Goff of conspiracy to launder money.

**F. Vindictive Prosecution**

In his final argument challenging his convictions, Goff contends that the Government chose to prosecute him based solely on his decision not to assist the Government following his initial arrest and conviction and his refusal to testify before the grand jury investigating Marshall in July 2004. This claim fails because Goff has not shown that he exercised a protected right which led to the alleged vindictive prosecution.

*1. Standard of Review*

Generally, we review the denial of a motion to dismiss based upon allegations of vindictive prosecution for abuse of discretion. *See United States v. Moon*, 513 F.3d 527, 534 (6th Cir. 2008); *see also United States v. Poole*, 407 F.3d 767, 772 (6th Cir. 2005) (applying abuse-of-discretion standard but noting that this Court also has reviewed findings that there was no vindictiveness under the clearly-erroneous standard). However, while Goff raised a grand-jury-misuse argument before the district court, he did not raise the vindictive-prosecution argument he presents on appeal. Therefore, we review this claim only for plain error. *See United States v. Walls*, 293 F.3d 959, 970 (6th Cir. 2002) (citing *United States v. Wade*, 266 F.3d 574, 584 (6th Cir. 2001)).

*2. Standard for Vindictive-Prosecution Claims*

"It is well established that due process protects against prosecutorial retaliation for a defendant's exercise of a statutory or constitutional right." *Moon*, 513 F.3d at 535. In order to succeed on a claim of vindictive prosecution, a defendant must demonstrate "'actual vindictiveness,' by producing 'objective evidence that a prosecutor acted in order to punish the defendant for standing on his legal rights,'" or, alternatively, "'a realistic likelihood of vindictiveness[.]'" *United States v. Dupree*, 323 F.3d 480, 489 (6th Cir. 2003) (quoting *Bragan v. Poindexter*, 249 F.3d 476, 481-82 (6th Cir. 2001)). To prevail on a claim via this second approach, a defendant must demonstrate: "(1) [the] exercise of a protected right; (2) a prosecutorial stake in the exercise of that right; (3) unreasonableness of the prosecutor's conduct; [and] (4) the intent to punish the defendant for exercise of the protected right." *United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001). Also, "prosecutorial vindictiveness can potentially be found in the pre-trial addition of charges following pre-trial assertions of protected rights." *Id.*

*3. Discussion*

In support of his vindictive-prosecution claim, Goff relies specifically on the fact that he was listed as a previously convicted conspirator in the original 2004 indictment, but was listed as a co-defendant in the subsequent superseding indictments. The Government does not deny that it had a "stake" in Goff's refusal to cooperate or testify before the grand jury, but argues that Goff cannot satisfy the other three prongs of our test. Goff does not state whether he is attempting to make out a claim of actual vindictiveness or a reasonable likelihood of vindictiveness. We analyze the claim under the reasonable-likelihood framework because he has not put forth any objective evidence that

the prosecutors were acting to punish him for exercising his rights, and a showing of actual vindictiveness is "'exceedingly difficult to make.'" *Bragan*, 249 F.3d at 481 (quoting *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987)).

Goff's vindictive-prosecution claim fails because he cannot demonstrate that he was exercising a protected right by refusing to testify before the grand jury. This Court previously considered Goff's refusal to testify, and determined that this refusal was not protected by his Fifth Amendment right against self-incrimination. *See In re Goff*, 112 F. App'x at 423 n.1. After his initial refusal to answer questions, the district court issued an order directing Goff to testify. *Id.* at 423. When Goff again refused to answer questions, asserting his Fifth Amendment right against self-incrimination, the district court issued an order compelling, and granting him immunity for, his testimony: "Such testimony compelled under this Order may not be used against Charles Goff, Jr. in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with this Order." *Id.* When Goff refused yet again to testify, the district court found him in civil contempt and ordered him to a period of confinement not credited to the federal sentence he already was serving pursuant to 28 U.S.C. § 1826(a). *Id.* at 423-24. This Court upheld the finding of contempt and the period of confinement because Goff's fear that his family might be harmed based on his testimony did not qualify as just cause to excuse his obligation to testify under § 1826(a). *Id.* at 424 (citing *Piemonte v. United States*, 367 U.S. 556, 559 (1961), and *In re Grand Jury Investigation*, 922 F.2d 1266, 1273 (6th Cir. 1991)). In doing so, the panel determined that the district court's grant of immunity "eviscerate[d] any Fifth Amendment claim." *Id.* at 423 n.1.

- 41 -

The Fifth Amendment privilege against self-incrimination "is grounded on a reasonable fear of danger of prosecution." *United States v. Damiano*, 579 F.2d 1001, 1003 (6th Cir. 1978). Because Goff was granted immunity to testify, it was not reasonable for him to fear prosecution based on his testimony. Therefore, as the previous panel determined, his refusal to testify was not protected by the Fifth Amendment. Consequently, his refusal to testify cannot satisfy the first prong of the vindictive-prosecution test. Goff also asserts a "constitutional right not to testify against . . . others," (Goff Br. 29), but provides no legal basis for such a right. To the extent that Goff argues that the Government acted vindictively by prosecuting him based on his general refusal to cooperate with authorities (presumably by refusing to cooperate against his co-conspirators in exchange for a plea deal), his claim still fails to satisfy this prong of the test. *Cf. United States v. DeJohn*, 368 F.3d 533, 545 (6th Cir. 2004) ("This circuit has consistently indicated that when the right asserted by the defendant is simply the right to go to trial, an additional charge entered after a failed plea bargain cannot . . . form the substance of a viable vindictive prosecution claim."); *Walls*, 293 F.3d at 970 ("When the pretrial addition of more serious charges results merely from the failure of the plea bargaining process, it is not vindictive prosecution."). Finally, as the Government notes, Goff's theory of retaliation does not explain why he was not listed as a co-defendant in the original indictment, since that indictment was issued in October 2004, three months after his refusal to testify. If the Government truly was retaliating against him for refusing to testify, it seems more likely that he would have been charged in the first indictment, just months after his refusal.

Based on this analysis, we reject Goff's claim of vindictive prosecution.

**G. *Ex Post Facto* Clause**

We now turn to Goff's sentencing arguments. He first alleges that the district court violated his *Ex Post Facto* Clause rights by using the 2007 edition of the U.S. Sentencing Commission's Guidelines Manual ("the Manual") in calculating his advisory U.S. Sentencing Guidelines ("the Guidelines" or "U.S.S.G.") range. This claim fails because calculating his sentence using the edition of the Manual in effect at the time of the commission of his offense would not result in a shorter advisory Guidelines range.

*1. Standard of Review*

*Ex Post Facto* challenges raise questions of law that this Court reviews de novo. *United States v. Duane*, 533 F.3d 441, 445 (6th Cir. 2008); *see also United States v. Lacefield*, 146 F. App'x 15, 21 (6th Cir. 2005) ("Determining the appropriate version of the guidelines [to apply] is a matter of law that we review de novo."). However, to the extent that sentencing issues turn on factual issues, this Court reviews the district court's factual findings for clear error. *See United States v. Shafer*, 573 F.3d 267, 272 (6th Cir. 2009).

*2. Standards for* Ex Post Facto *Sentencing Claims*

"The purpose of the [*Ex Post Facto* Clause] is to protect citizens against a 'lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" *Duane*, 533 F.3d at 445 (quoting *Weaver v. Graham*, 450 U.S. 24, 30 (1981)). "'The *Ex Post Facto* Clause is implicated where a law punishes retrospectively; a law is retrospective if it changes the legal consequences of acts completed before its effective date.'" *United States v. Gardiner*, 463 F.3d 445, 462 (6th Cir. 2006) (quoting *United States v. Davis*, 397

F.3d 340, 347 (6th Cir. 2005)). In the Guidelines context, a defendant has an *Ex Post Facto* claim

when the retroactive application of an edition of the Manual exposes the defendant to a harsher

advisory Guidelines range than the defendant would have been exposed to under the edition of the

Manual in effect at the time the defendant committed the crime. *See Davis*, 397 F.3d at 347-48

(finding an *Ex Post Facto* violation occurred where the defendant was sentenced to 33 months in

prison under a Guidelines range of 33 to 41 months and the earlier edition of the Manual would have

resulted in a Guidelines range of 30 to 37 months).

"Generally, the district court is instructed to apply the version of the Sentencing Guidelines

that were in place at the time of a defendant's sentencing, unless applying the current Guidelines

would amount to a violation of the *Ex Post Facto* Clause." *Gardiner*, 463 F.3d at 462 (citing *Davis*,

397 F.3d at 346); *see also* U.S.S.G. § 1B1.11(a)-(b)(1). Further, under the so-called "one book rule,"

the Guidelines advise against using more than one edition of the Manual in a single case, except

when the court is applying an earlier edition of the Manual, in which event "the court shall consider

subsequent amendments [to the Guidelines], to the extent that such amendments are clarifying rather

than substantive changes." U.S.S.G. § 1B1.11(b)(2); *see Duane*, 533 F.3d at 447. Finally, the

Guidelines state that "[i]f the defendant is convicted of two offenses, the first committed before, and

the second after, a revised edition of the Guidelines Manual became effective, the revised edition of

the Guidelines Manual is to be applied to both offenses." U.S.S.G. § 1B1.11(b)(3).

*3. Discussion*

Goff contends that the district court violated his *Ex Post Facto* Clause rights by using the

2007 edition of the Manual—the edition in effect at the time of his sentencing—rather than the

edition of the Manual in effect on the date of the commission of his offenses, which he argues would have resulted in a shorter advisory Guidelines range. Goff's *Ex Post Facto* claim fails for two reasons. First, he misidentifies the date of the commission of his offense as 1999, rather than 2004, and there is no difference in the Guidelines provisions applicable to him between the edition of the Manual in effect in 2004 and the 2007 edition. Second, even if the 1998 edition of the Manual were the relevant edition for comparison, there would be no *Ex Post Facto* violation because Goff is subject to the same advisory Guidelines range under that edition, 360 months to life.[4]

Goff's first misstep is that he makes his *Ex Post Facto* Guidelines comparison using the incorrect edition of the Manual. He argues that the 2007 edition—which was used at his sentencing—should be compared to the edition of the Manual in effect in 1999,[5] when his last, overt money-laundering conduct took place. This Court rejected a similar argument in *Gardiner*, concluding that, for sentencing purposes, the date of commission of a conspiracy is established by when the conspiracy was terminated, not the date when the defendant last carried out an act in

---

[4]The Government briefly suggests that such *Ex Post Facto* Clause challenges may no longer be available to defendants because, after *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines are now advisory. However, in *Duane*, we refused to hold that such claims are no longer cognizable, noting that we have continued to consider such claims post-*Booker*; that, in an analogous context, discretionary parole guidelines can give rise to *Ex Post Facto* claims; and that a number of other circuits have continued to analyze such claims post-*Booker*. *Duane*, 533 F.3d at 446 n.1, 447. We find the Government's argument unpersuasive. Although Goff's *Ex Post Facto* claim fails, we continue to recognize the viability of such claims in the Guidelines context.

[5]Despite both parties' references to the 1999 edition of the Manual, the 1998 edition of the Manual, issued November 1, 1998, remained in effect throughout 1999. The 1998 edition was supplemented on May 1, 2000, and replaced with a new edition on November 1, 2000. *See* United States Sentencing Commission, *Guide to Publications & Resources 2007-2008*, at 8-9 (2007), *available at* http://www.ussc.gov/publicat/cat2005.pdf.

furtherance of the conspiracy. *See Gardiner*, 463 F.3d at 462-64. In doing so, we noted that "'where a conspiracy contemplates a continuity of purpose and continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn.'" *Id.* at 463 (quoting *United States v. Mayes*, 512 F.2d 637, 642 (6th Cir. 1975)). Further, we concluded that "[h]aving proved the existence of the criminal enterprise and the conspiracy, . . . the government was entitled to a presumption that the conspiracy continued absent an affirmative showing that the conspiracy was terminated or that [the defendant] withdrew." *Id.* at 464. Because the defendant was not able to rebut this presumption, we found that the district court correctly employed the later edition of the Manual, eliminating any *Ex Post Facto* problems. *Id.*

Under *Gardiner*, the fact that Goff's direct money-laundering activities ended in 1999 does not control the date of the commission of his offenses for *Ex Post Facto* sentencing considerations. Goff is correct that the specific transactions in which he was involved took place in 1998 and 1999. Indeed, many of the alleged money-laundering activities consisted of mortgage-fraud schemes in which, according to Marshall's testimony, Goff did not participate. However, Marshall also testified about other transactions included in the money-laundering conspiracy that occurred as late as 2003. Moreover, the indictment alleged that the money-laundering conspiracy lasted until March 10, 2004. Goff does not contend that the money-laundering conspiracy ended before 2004 or that he affirmatively withdrew from the money-laundering conspiracy, only that his "conduct as to money laundering occurred in 1999." (Goff Br. 31.) Once the Government proved that the money-laundering conspiracy "contemplate[d] a continuity of purpose and continued performance of

acts"—namely, ongoing financial transactions, at least one purpose of which was to conceal proceeds from the ongoing drug conspiracy—it was entitled to a presumption that the conspiracy continued and Goff remained a party to the conspiracy until and unless he showed that the conspiracy was terminated or he affirmatively withdrew. *Gardiner*, 463 F.3d at 463. Goff makes no such showing.

Significantly, even if we were to find that the date of commission for the money-laundering conspiracy was in 1999, the date of the commission of the drug conspiracy would determine which edition of the Manual applied for both conspiracies under the "one book rule" because, according to the indictment, the drug conspiracy lasted until October 12, 2004. *See* U.S.S.G. § 1B1.11(b)(3). As in *Duane*, the two conspiracy counts were grouped together under U.S.S.G. § 3D1.2 and Goff does not challenge this grouping. *See Duane*, 533 F.3d at 449. Because the two counts were grouped together properly, and none of the other unique circumstances that existed in *Lacefield* is present here, the use of the "one book rule" does not support an *Ex Post Facto* claim. *See id.*

Therefore, for *Ex Post Facto* purposes, the correct issue to resolve is whether Goff was exposed to a harsher advisory range under the 2007 edition of the Manual than he would have been under the 2003 edition of the Manual, the edition in effect at the end of both conspiracies. Goff does not calculate his sentence under the 2003 edition nor claim that a comparison between the 2003 and 2007 editions would evince an *Ex Post Facto* violation. Indeed, the Guidelines provisions applicable to Goff appear to be identical in both editions. Therefore, the use of the 2007 edition did not violate the *Ex Post Facto* Clause.

Moreover, even if it were appropriate to calculate Goff's advisory Guidelines range using the edition of the Manual in effect in 1999, he would not have a valid *Ex Post Facto* claim because his

advisory Guidelines range is the same under this edition of the Manual. Goff is correct to note that the money-laundering Guideline applicable to Goff, U.S.S.G. § 2S1.1, appears in a considerably different form in the 1998 edition of the Manual than it does in the 2003 and 2007 editions. If used to calculate his sentence, the 1998 version of this Guideline would result in a lower total offense level and a shorter advisory Guidelines range. However, precisely because this Guideline would result in a lower total offense level, Goff's range instead would be calculated using the drug Guideline, U.S.S.G. § 2D1.1. *See* U.S.S.G. § 3D1.3(a) (requiring the count with the highest offense level to determine the offense level assigned to a U.S.S.G. § 3D12(b) group). Under the drug Guideline, Goff's base offense level would be 38, with the two-level obstruction-of-justice enhancement raising it to 40. While this is lower than his total offense level of 42 under the 2007 edition of the Manual, with his unchanged Criminal History Category of IV, it still results in an advisory Guidelines range of 360 months to life in prison. Accordingly, Goff would not have an *Ex Post Facto* claim even if the 1998 edition of the Manual were the correct point of comparison.

Based on this analysis, we reject Goff's *Ex Post Facto* Clause challenge.

**H. Obstruction-of-Justice Enhancement**

Goff's second sentencing argument is that the district court erred in applying the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1 in calculating his advisory Guidelines range because it violated his Fifth Amendment right against self-incrimination and because "silence can never amount to obstruction of justice." (Goff Br. 35.) This argument fails because Goff was granted immunity for his grand-jury testimony.

### 1. Standard of Review

This Court's past decisions are somewhat inconsistent in describing the standard of review we employ in evaluating claims that a district court improperly applied the obstruction-of-justice enhancement under U.S.S.G. § 3C1.1. *Compare, e.g.*, *United States v. Jackson-Randolph*, 282 F.3d 369, 389-90 (6th Cir. 2002), *with United States v. Carter*, 510 F.3d 593, 597 (6th Cir. 2007). The most comprehensive approach, which we apply here, follows a three-step inquiry. First, we review the factual findings made by the district court in applying the enhancement for clear error. *United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009). Second, we review de novo the district court's determination as to whether the facts constitute an obstruction of justice, which is a mixed question of law and fact. *Id.* Third, we review de novo the actual imposition of the enhancement. *Id.*; *see also United States v. Ellison*, 336 F. App'x 483, 486 (6th Cir. 2009).

### 2. Discussion

The Guidelines' obstruction-of-justice enhancement provision states:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense or conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

U.S.S.G. § 3C1.1. The Guideline's application notes provide a non-exhaustive list of examples of conduct intended to be covered by the provision, which includes "destroying or concealing . . . evidence that is material to an official investigation or judicial proceeding" and "wilfully failing to appear, as ordered, for a judicial proceeding." U.S.S.G. § 3C1.1 cmt. n.4(d)-(e). The application

notes also state that the "provision is not intended to punish a defendant for the exercise of a constitutional right." *Id.* § 3C1.1 cmt n.2.

The district court applied the enhancement to Goff's offense level calculation based on his "refus[al] to testify before the grand jury even after the Government filed a compulsion order." (R.E. 729, at 18.) Goff does not challenge this factual basis. Instead, he contends that the application of the enhancement violates his Fifth Amendment right against self-incrimination because it is based solely on his refusal to testify before the grand jury. This argument fails because, as this Court previously held, the district court's grant of immunity "eviscerate[d] any Fifth Amendment claim." *In re Goff*, 112 F. App'x at 423 n.1. Goff provides no legal support for his argument that "silence can never amount to obstruction of justice" under U.S.S.G. § 3C1.1 nor any factual support for his contention that his refusal to testify was not willful.

Indeed, this Court has held that "when a defendant has provided no adequate justification as to why he was unable to comply with a grand jury subpoena, the defendant's failure to appear is, by itself, sufficient to satisfy the government's burden that [the] defendant willfully obstructed or impeded the administration of justice." *United States v. Dunham*, 295 F.3d 605, 609 (6th Cir. 2002) (holding that U.S.S.G. § 3C1.1 enhancement was applied properly for a defendant who failed to appear before a grand jury after being subpoenaed to appear to provide handwriting exemplars and have his tattoos photographed). Similarly, this Court has held that the enhancement applied where the defendant "asked [a witness] to 'take the fifth' before the grand jury." *United States v. Kimball*, 194 F. App'x 373, 379 (6th Cir. 2006); *see also United States v. Gray*, 521 F.3d 514, 543 (6th Cir. 2008) (affirming application of U.S.S.G. § 3C1.1 enhancement for a defendant who withheld

documents responsive to grand jury subpoena and introduced perjured testimony); *Carter*, 510 F.3d at 598-600 (holding that a defendant's failure to appear pursuant to an IRS-issued summons requiring him to provide fingerprint and handwriting samples warranted a U.S.S.G. § 3C1.1 enhancement). Similarly here, we conclude that the district court was correct in applying the obstruction-of-justice enhancement based on Goff's refusal to testify after being granted immunity.

## I. Reasonableness of Sentence

Finally, Goff contends that his 360-month prison sentence is unreasonable because (1) the district court required that his prison term be served consecutively to the prison term he already was serving, (2) the sentence is unreasonably long when compared to the sentences imposed upon his co-conspirators, and (3) the sentence is unreasonably long given his personal history and characteristics. We conclude that the district court's consideration of whether to impose a consecutive sentence and its consideration of the 18 U.S.C. § 3553(a) factors was inadequate.

### 1. Standard of Review

This Court reviews challenges to sentences imposed by a district court for reasonableness under an abuse-of-discretion standard. *Warman*, 578 F.3d at 349 (citing *Gall v. United States*, 552 U.S. 38, 46 (2007)). This inquiry has both procedural and substantive components. *Id.* However, because Goff does not make a procedural-reasonableness challenge, we "need only consider the substantive reasonableness of the sentence imposed." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632 (6th Cir. 2010) (internal quotation marks omitted); *cf. United States v. Berry*, 565 F.3d 332, 342 (6th Cir. 2009) ("A challenge to a court's decision to impose a consecutive or a concurrent sentence is not easily classified as 'substantive' or 'procedural.' This is because an evaluation of the

substantive reasonableness of a decision to impose a consecutive sentence depends heavily upon an evaluation of the procedural reasonableness.").

"The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *Tristan-Madrigal*, 601 F.3d at 632-33. A sentence is substantively unreasonable "where the district court selects the sentence arbitrarily, bases the sentence on impermissible factors, fails to consider pertinent § 3553(a) factors or gives an unreasonable amount of weight to any pertinent factor." *Warman*, 578 F.3d at 351 (internal quotation marks and brackets omitted). In conducting this review, "we must take into account the totality of the circumstances;" however, "a sentence that falls within the Guidelines range warrants a presumption of reasonableness." *Tristan-Madrigal*, 601 F.3d at 633 (internal quotation marks omitted).

*2. Discussion*

Goff's first argument is that his convictions in this case are so closely related to the cocaine-distribution conspiracy charge to which he pleaded guilty in the earlier case, "a concurrent term is the only appropriate term to impose." (Goff Br. 37.) While we disagree that a concurrent term was the *only* reasonable term that the district court could have imposed, we conclude that the district court failed to explain adequately why it chose to impose a consecutive sentence. Specifically, the district court erred because it did not consider the § 3553(a) factors in making this determination, did not set forth any specific analysis as to why it was imposing a consecutive sentence, and implied that it did not have discretion to impose a concurrent sentence.

There are both statutory and Guidelines provisions that bear on a district court's decision to impose a consecutive sentence. Under U.S.S.G. § 5G1.3(a), "[i]f the instant offense was committed while the defendant was serving a term of imprisonment . . . the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment." Similarly, under 18 U.S.C. § 3584(a), "if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively . . . . Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently." However, sentencing courts are required by statute to exercise discretion in choosing between a consecutive and concurrent sentence. "The court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, *shall consider*, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)." *Id.* § 3584(b) (emphasis added); *see also United States v. Rainer*, 314 F. App'x 846, 847 (6th Cir. 2009) ("Notwithstanding the seemingly mandatory language of U.S.S.G. § 5G1.3(a), we have recognized that the district court has discretion to impose consecutive or concurrent sentences pursuant to 18 U.S.C. § 3584 and U.S.S.G. § 5G1.3 . . . ."). "[W]here the district court states that § 5G1.3 requires that it impose a consecutive sentence, the court has failed to recognize its discretion, the statement constitutes plain error, and the case must be remanded for resentencing." *Rainer*, 314 F. App'x at 847. While the district court's decision to impose a consecutive sentence is discretionary so long as the court has considered the § 3553(a) factors, "[i]t is an abuse of that discretion . . . when a sentencing court fails to 'make generally clear the rationale under which it has imposed the consecutive sentence.'" *United States v. Ross*, No. 08-6499, 2010

WL 1655838, at *4 (6th Cir. Apr. 26, 2010) (unpublished) (quoting *United States v. Johnson*, 553 F.3d 990, 998 (6th Cir. 2009)).

The district court failed to comply with these requirements in sentencing Goff to a consecutive term. The Presentence Investigation Report recommended that Goff's sentence run consecutive to the sentence he already was serving under U.S.S.G. § 5G1.3(a) because some of his offense conduct occurred after he had received the earlier sentence. At the sentencing hearing, in responding to an argument from Goff that his criminal history score had been miscalculated, the court noted that Goff was sentenced to a 188-month prison term on March 27, 1999, and found that from that time until October 12, 2004, "Goff maintained an agreement with Mr. Marshall to receive [a] $2,000 commission for each kilogram of cocaine distributed by Marshall." (R.E. 729, at 19.) Further, the court found that some of Goff's money-laundering offense conduct, namely the sale of the Plymouth Prowler in April 1999, occurred after he already had received his earlier sentence. While the court made these findings specifically in regard to the calculation of Goff's criminal history score, the findings also serve as the factual basis for applying U.S.S.G. § 5G1.3(a). The court addressed the issue of a possible consecutive sentence shortly thereafter, stating that, "[p]ursuant to guideline 5G1.3(a) if the instant offense was committed while the Defendant was serving a term of imprisonment . . . the sentence for the instant offense *shall* be imposed to run consecutive to the undischarged term of imprisonment." (*Id.* at 21 (emphasis added).) Although the court discussed other applicable Guidelines and statutory sentencing provisions, it did not mention § 3584. After the parties presented their arguments, and the court briefly discussed the § 3553(a) factors, the court handed down Goff's 360-month sentence, stating that it "is to be served consecutive with your

present undischarged term of imprisonment," with no further explanation. (*Id.* at 38.) Perhaps

because of the court's failure to explain this point adequately, Goff and the court then had a brief

colloquy on the issue:

> THE COURT: Consecutive to -- I think you have got about four years left. It sounds like you have got four years left on your other sentence. I think. I don't know that. But it is consecutive to that.
>
> THE DEFENDANT: So, that is 30 years plus the time I have got left . . . ?
>
> THE COURT: Right.

(*Id.* at 39-40.)

The district court's decision to impose a consecutive sentence fell short in three respects.

First, it appears that the court did not consider the § 3553(a) factors in making this decision, as

required by § 3584(b). In *Ross*, this Court determined that the district court abused its discretion by

imposing a consecutive sentence because it did not reference any of the § 3553(a) factors in its

discussion of the concurrent sentence, even though the court did discuss the specific factual

circumstances of the case that led the court to impose a consecutive sentence and discussed the

§ 3553(a) factors in regards to the length of the sentence. *Ross*, 2010 WL 1655838, at *5. Further,

as here, because the discussion of the § 3553(a) factors that did take place was cursory,"[e]ven if we

were to apply the court's eventual references to the sentencing factors to its denial of [the

defendant's] request for a concurrent sentence, we would still find that there was insufficient

consideration of these factors in the court's decision." *Id.* at *6; *see also United States v. Clark*, 385

F.3d 609, 623-25 (6th Cir. 2004) (holding that the district court erred in imposing a consecutive

sentence because the sentencing hearing indicated that the court considered only one of the U.S.S.G.

§ 5G1.3 application notes, and not the factors listed in § 3553(a) or the Guideline itself, in making this determination); *cf. Berry*, 565 F.3d at 343 (concluding that when a court's general § 3553(a) analysis supports the decision to impose a consecutive sentence, a separate discussion is not required).

Second, the district court abused its discretion by failing to explain its rationale for sentencing Goff to a consecutive, rather than concurrent, prison term. *See Johnson*, 553 F.3d at 998. The only rationale offered by the district court was its brief mention of the applicability of U.S.S.G. § 5G1.3(a). Because the decision to impose a consecutive sentence was discretionary despite the seemingly mandatory language of this Guideline, this explanation was insufficient under § 3584.

Indeed, the third way in which the district court abused its discretion is that its very brief discussion of U.S.S.G. § 5G1.3(a) indicates that the court may not have recognized the discretionary nature of this decision. Although the court stated that the Guidelines were advisory several times during the sentencing hearing, these statements were made in regard to the Guidelines range calculation, not U.S.S.G. § 5G1.3 or the court's decision to impose a consecutive sentence. The only time that the court mentioned U.S.S.G. § 5G1.3(a), it simply quoted the Guideline's language which misleadingly implies that consecutive sentences are mandatory for defendants in Goff's position. Because the court provided no other explanation for why it was imposing a consecutive sentence, this statement suggests that the district court failed to recognize that it had discretion in choosing between consecutive and concurrent sentences, and therein abused its discretion. *See United States v. Gibbs*, 506 F.3d 479, 488 (6th Cir. 2007) ("In light of the explicit [discretionary] language of § 5G1.3(c), the district court's statement that [the defendant's] federal sentence must be consecutive

to his state sentence constitutes plain error."); *cf. Rainer*, 314 F. App'x at 847-48 (affirming consecutive sentence because "the court's remarks evidence that it was aware of its discretion to impose either a concurrent or consecutive sentence"); *United States v. Watford*, 468 F.3d 891, 917 (6th Cir. 2006) (affirming sentence because the court specifically stated that it had considered the relevant Guidelines and statutory provisions which "indicate[d] that the court understood that it could impose either a concurrent or consecutive sentence").

Goff presents two additional arguments regarding the reasonableness of his sentence. First, he argues that his sentence is unreasonable because his co-conspirators received prison terms shorter than he received. This argument is unavailing. Although § 3553(a)(6) requires sentencing courts to consider avoiding sentencing disparities between similarly situated defendants at the national level, "[c]onsidering uniformity between *co-defendants'* sentences . . . is not required by the Sentencing Guidelines or the § 3553(a) factors." *United States v. Simmons*, 501 F.3d 620, 623 (6th Cir. 2007) (emphasis added). While it would have been permissible for the district court to consider sentencing disparities between Goff and his co-defendants, *see United States v. Presley*, 547 F.3d 625, 631-32 (6th Cir. 2008), the court was not required to do so, particularly because Goff did not raise a disparity argument, *cf. United States v. Wallace*, 597 F.3d 794, 803-06 (6th Cir. 2010) (finding a sentence to be procedurally unreasonable because the district court failed to respond to the defendant's main argument, which concerned a potential disparity between her sentence and her co-defendant's sentence). Further, there are a number of permissible reasons that the court could have relied upon to justify giving Goff a longer sentence than his co-defendants, including his failure

to cooperate with the authorities, the fact that he participated in the conspiracies while on house arrest and in prison, and his unique role in facilitating the drug conspiracy.

Lastly, Goff argues that his prior history and conduct justify a shorter sentence, noting that he participated in a drug program while incarcerated for the previous offense, did not have an extensive criminal record, and had strong family support from his mother. Given the fact that Goff continued to conspire to sell drugs even while he was in prison, we have grave doubts about whether his personal history or conduct militates in favor of a below-Guidelines sentence. However, the district court was required to consider Goff's personal history and characteristics under § 3553(a)(1), and the court's consideration of that factor, as well as the other § 3553(a) factors, was cursory at best. While "there is no requirement that the district court engage in a ritualistic incantation of the § 3553(a) factors it considers, the district court's sentence should nonetheless reflect the considerations listed in § 3553(a)." *United States v. Chandler*, 419 F.3d 484, 488 (6th Cir. 2005) (internal quotation marks, brackets, ellipsis, and citation omitted). On remand to consider the consecutiveness issue, we recommend that the district court provide a more comprehensive analysis of the § 3553(a) factors to facilitate any subsequent appellate review.

### III. CONCLUSION

Based on the foregoing analysis, we **AFFIRM** Goff's convictions, **VACATE** his sentence, and **REMAND** for resentencing proceedings consistent with this opinion.

**ALICE M. BATCHELDER, Chief Judge, concurring**.  I join the lead opinion, but I write separately to note that I do not agree that the district court failed to give sufficient consideration to Goff's personal history and characteristics — or, for that matter, the other factors — under 18 U.S.C. § 3553(a).  As the lead opinion concedes, we do not require a "ritual incantation" of these factors. Rather, as we have repeatedly held, "[w]hile the district court need not engage in a ritualistic incantation to establish consideration of a legal issue or make specific findings related to each of the factors considered, the district court must articulate the reasons it reached the sentence imposed." *United States v. Petrus*, 588 F.3d 347, 353 (6th Cir. 2009) (internal quotation marks and citations omitted); *see also United States v. Simmons*, 587 F.3d 348, 359 (6th Cir. 2009) (holding that a "terse" analysis using "generic language" and lacking "elaboration" is not "per se inadequate").  I do not dispute that here, the sentencing judge was terse, and that he did not engage in elaboration. But his explanation to the defendant followed an explicit and detailed description by the government of each of the § 3553(a) factors, and the judge himself mentioned each of the factors and, albeit without elaboration, told the defendant how they figured in the sentence.  In my view that is enough.